No. 22-1801

_____

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

   *Plaintiff-Appellee,*

   v.

STEVEN SORENSEN,

   *Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Western District of Wisconsin,
Case No. 3:21-CR-56-JDP
The Honorable James D. Peterson, Presiding

_____

**OPENING BRIEF AND SHORT APPENDIX OF
DEFENDANT-APPELLANT STEVEN SORENSEN**

_____

Jessica Arden Ettinger
   *Counsel of Record*
Joseph A. Bugni
FEDERAL DEFENDER SERVICES
   OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin  53703
(608) 260-9900
jessica_ettinger@fd.org

*Counsel for Steven Sorensen*

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, undersigned counsel informs the Court that Federal Defender Services of Wisconsin, Inc., by Joseph A. Bugni and Alexander Vlisides, represented defendant-appellant Steven Sorensen, who is a natural person, in the District Court for the Western District of Wisconsin before the Honorable James D. Peterson, Chief District Judge, and Stephen L. Crocker, Magistrate Judge. Federal Defender Services of Wisconsin, Inc., by Jessica Arden Ettinger and Joseph A. Bugni, represents Mr. Sorensen before this Court.

Date: November 3, 2022

*/s/ Jessica Arden Ettinger*
Jessica Arden Ettinger

*Counsel for Steven Sorensen*

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT..................................................................................(i)

TABLE OF AUTHORITIES................................................................................ iv

JURISDICTIONAL STATEMENT ......................................................................1

ISSUE PRESENTED ...........................................................................................2

STATEMENT OF THE CASE .............................................................................3

    A.    Steven Sorensen came into possession of a gun by accident.........................3

    B.    Sorensen took immediate, reasonable steps to get rid of the gun safely by trying to surrender it to Eau Claire County's Restorative Justice Program. ..........................................................5

    C.    When Sorensen couldn't safely dispose of the gun, he left it on a shelf, brought the police back to find it later, and was indicted. ...........................................................................8

    D.    Sorensen's theory of the case depended on an affirmative innocent possession defense.................................................9

        1.    Courts identify affirmative defenses by consulting the statute's text, common-law principles, common sense and state court practice. ........................................9

        2.    The court of appeals have split over whether to recognize an affirmative innocent possession defense to § 922(g). ..................12

    E.    The district court denied the defense's motion *in limine*, and Sorensen entered a conditional guilty plea that permits this appeal........................................................................14

SUMMARY OF THE ARGUMENT ......................................................................16

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**TABLE OF CONTENTS—Continued**

Page

ARGUMENT ................................................................................................18

I.    Innocent possession is an affirmative defense to a § 922(g) charge........................18

      A.    The text of § 922(g), informed by the common law, common
            sense, and state practice, supports recognition of an innocent
            possession defense. .......................................................................18

      B.    Those courts that have declined to recognize an affirmative
            innocent possession defense have done so based on faulty
            reasoning. .......................................................................................26

      C.    The Court should adopt a modified version of the *Mason* test. ..................30

II.   The proffered evidence warrants remand so that Sorensen may present
      an innocent possession defense theory to the jury......................................34

CONCLUSION ............................................................................................39

CERTIFICATE OF COMPLIANCE AND SERVICE

CIRCUIT RULE 30(d) STATEMENT

SHORT APPENDIX

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dixon v. United States,*
548 U.S. 1 (2006) .................................................................. *passim*

*Elonis v. United States,*
575 U.S. 723 (2015) ...................................................................... 9

*Fuller v. State,*
126 S.W. 569 (Tex. Ct. Crim. App. 1910) ...................................... 22, 24

*Hines v. United States,*
326 A.2d 247 (D.C. 1974).............................................................. 23

*Marinello v. United States,*
138 S. Ct. 1101 (2018)................................................................. 29

*Morissette v. United States,*
342 U.S. 246 (1952).............................................................. 10, 25

*People v. Hurtado,*
47 Cal. App. 4th 805 (Cal. Ct. App. 1996)...................................... 25

*People v. La Pella,*
4 N.E.2d 943 (N.Y. 1936) (per curiam) .......................................... 22

*People v. Persce,*
97 N.E. 877 (N.Y. 1912) .............................................................. 22

*Rehaif v. United States,*
139 S. Ct. 2191 (2019).......................................................... 9, 10, 19

*Ruan v. United States,*
142 S. Ct. 2370 (2022).................................................................. 10

*Small v. United States,*
544 U.S. 385 (2005) .................................................................... 33

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

# TABLE OF AUTHORITIES—Continued

Page(s)

*State v. Cartwright,*
    418 P.2d 822 (Or. 1966) ................................................................. 23

*State v. Phinis,*
    430 P.2d 251 (Kan. 1967) .............................................................. 23

*State v. Williams,*
    29 N.W. 801 (Iowa 1886) ............................................................... 22

*United States v. Bailey,*
    444 U.S. 394, (1980) ............................................................... 11, 29

*United States v. Baird,*
    712 F.3d 623 (1st Cir. 2013) ............................................... 13, 26, 38

*United States v. Baker,*
    508 F.3d 1321 (10th Cir. 2007) ................................... 14, 25, 27, 29

*United States v. Baker,*
    523 F.3d 1141 (10th Cir. 2008) ................................................ 10, 28

*United States v. Becerra,*
    958 F.3d 725 (8th Cir. 2020) ................................................... 14, 26

*United States v. Cherry,*
    921 F.3d 690 (7th Cir. 2019) ................................................... 14, 35

*United States v. Dingwall,*
    6 F.4th 744, (7th Cir. 2021) ................................... 12, 32, 34, 35

*United States v. Elder,*
    16 F.3d 733 (7th Cir. 1994) ................................................ 20, 25, 31

*United States v. Gilbert,*
    430 F.3d 215 (4th Cir. 2005) ............................... 14, 27, 28, 29

*United States v. Hendricks,*
    319 F.3d 993 (7th Cir. 2003) ............................... 14, 31, 35, 36

v

## TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Jackson,*
  598 F.3d 340 (7th Cir. 2010) ................................................. 14, 18, 33, 35

*United States v. Johnson,*
  459 F.3d 990 (9th Cir. 2006) ............................................... 14, 27, 28, 29

*United States v. Johnson,*
  816 F. App'x 604 (2d Cir. 2020) ........................................................ 13

*United States v. Kirby,*
  74 U.S. (7 Wall.) 482 (1868) .......................................................... 11, 22

*United States v. Langforddavis,*
  454 F. App'x 34 (3d Cir. 2011) ........................................................ 13

*United States v. Mason,*
  233 F.3d 619 (D.C. Cir. 2001) ................................................... *passim*

*United States v. Mayfield,*
  771 F.3d 417 (7th Cir. 2014) (en banc) ........................................ 34, 35

*United States v. Nwoye (Nwoye II),*
  824 F.3d 1129 (D.C. Cir. 2016) ........................................................ 32

*United States v. Ortiz,*
  927 F.3d 868 (5th Cir. 2019) ........................................................... 13

*United States v. Panter,*
  688 F.2d 268 (5th Cir. 1982) ........................................................... 11

*United States v. Perez,*
  86 F.3d 735 (7th Cir. 1996) ........................................................ 20, 25

*United States v. Singleton,*
  902 F.2d 471 (6th Cir. 1990) ........................................................... 11

*United States v. Toney,*
  27 F.3d 1245 (7th Cir. 1994) ...................................................... 20, 25

vi

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*United States v. Vereen*,
   920 F.3d 1300 (11th Cir. 2019) ............................................................ 14, 27, 28, 29

*United States v. Waldman*,
   835 F.3d 751 (7th Cir. 2016) ...................................................................... 11, 12, 34

*Wooden v. United States*,
   142 S. Ct. 1063 (2022) .......................................................................................... 21


**Constitutional Provisions**

U.S. CONST. amend. V.............................................................................................. 33


**Public Laws and Statutes**

18 U.S.C. § 1202 ...................................................................................................... 11

18 U.S.C. § 922 ............................................................................................... *passim*

18 U.S.C. § 924 ...................................................................................................... 19

An Act to Strengthen the Federal Firearms Act,
   Pub. L. 87–342, § 2, 75 Stat. 757 (1961) ............................................................ 19

Federal Firearms Act,
   Pub. L. 785, § 2(f), 52 Stat. 1251 (1938) ............................................................ 19

Firearm Owners' Protection Act,
   Pub. L. 99–308, § 102(6), 100 Stat. 452 (1986) .................................................. 19

Title VII of the Omnibus Crime Control and Safe Streets Act of 1968,
   Pub. L. 90-351, § 1202, 82 Stat. 236 ................................................................... 19

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

TABLE OF AUTHORITIES—Continued

**Page(s)**

**Books and Dictionaries**

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW  (2012) ..............................................21

BLACK'S LAW DICTIONARY (11th ed. 2019) ................................................................................ 21

DICTIONARY OF THE ENGLISH LANGUAGE (Bolles ed. 1853) ................................................... 20

DICTIONARY OF THE ENGLISH LANGUAGE (Johnson ed. 1877) ............................................... 20

W. Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND (1769) ...................................... 9

WEBSTER'S NEW WORLD DICTIONARY (Coll. ed. 1962) ............................................................ 20


**Other Authorities**

*Accountability Mentoring*, GOODWILL,
    https://tinyurl.com/3ebm5cee (last visited Nov. 3, 2022) ............................................. 6

Allison Garfield, *State agencies investigating fatal shooting by Dane County
Sheriff's Office Deputy*, THE CAP TIMES, Oct. 17, 2022,
    https://tinyurl.com/yvz396ry ............................................................................. 33

Hon. Frank Easterbrook, *The Case of the Speluncean Explorers: Revisited*,
112 HARVARD L. REV. 1913 (1999) ............................................................. 10, 11, 27

*Fatal Force*, WASH. POST,
    https://tinyurl.com/nhb2b7an (last updated Nov. 2, 2022) .......................................... 33

*Peace Circles*, GOODWILL,
    https://tinyurl.com/3x4ybfpc (last visited Nov. 3, 2022) ................................................. 6

Steve Almasy et al., *Two Chicago Police officers face felony charges
related to July shooting of unarmed man*, CNN (Sept. 17, 2022),
    https://tinyurl.com/2pd9ha9k .............................................................................. 33

Timothy Bella, *After a Black man is killed by police, a city cancels
its July Fourth celebration*, WASH. POST, July 1, 2022,
    https://tinyurl.com/33ju542f ............................................................................... 33

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

## JURISDICTIONAL STATEMENT

This is a direct appeal from a final judgment of conviction in a criminal case, alleging error in the denial of a motion *in limine* to present an affirmative innocent possession defense at trial. The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 18 U.S.C. § 3742(a)(1) and 28 U.S.C. § 1291. On April 22, 2022, the court held a combined change-of-plea and sentencing hearing, at which Mr. Sorensen entered a conditional guilty plea to one count of violating 18 U.S.C. § 922(g)(1) that preserved his right to challenge the denial of his motion *in limine* on appeal. The district court filed the Judgment and Commitment Order the same day, and the defense timely appealed on May 5, 2022. This appeal is from a final judgment that disposes of all parties' claims.

1

**ISSUE PRESENTED**

When a statute doesn't preclude an affirmative defense, the judiciary must identify what defenses exist, looking to common-law principles, common sense, and contemporaneous state practice for guidance.

Section 922(g) criminalizes the possession of a firearm by a felon, and it doesn't preclude affirmative defenses. The common law seeks to punish only those with a "vicious will." A common-sense reading of the term "possess" doesn't include briefly holding a gun in order to surrender it. And, both before Congress enacted § 922(g) and during the time Congress revised it, state courts recognized an innocent possession defense to their own unlawful-possession statutes.

Is there an innocent possession defense to § 922(g)?

2

## STATEMENT OF THE CASE

### A.    Steven Sorensen came into possession of a gun by accident.

In the early hours of a cold March morning in Eau Claire, Wisconsin, Steven Sorensen was in a bind. His car wouldn't start, and he needed help.[1] Sorensen walked several miles across town to ask his friend, Jeremy Belven, for assistance, but Belven didn't answer when Sorensen knocked.[2] Luckily, Sorensen ran into another friend, Jake Berg, in the parking lot of Belven's apartment complex.[3]

Berg was willing to lend a hand and someone else's car. He "invited [Sorensen] to his house," "pointed out a Subaru" parked across the street, and "told [Sorensen] to drive the car and follow him back to his house."[4] Cold and exhausted, Sorensen didn't question Berg's suggestion; he got in the Subaru.[5] But, on the drive to Berg's house, Sorensen "lost track of Berg's car" and "wasn't able to follow him."[6] Sorensen drove for a bit, then parked and fell asleep.[7] Unbeknownst to Sorensen, the Subaru didn't belong to Berg, and Berg did not have permission to use it.

---

[1] Sep.App.2 (¶1). Throughout this brief, abbreviations are used pursuant to Rule 28(e) of the Federal Rules of Appellate Procedure. Documents in the district court record are cited as "R.___:___," with the first number indicating the docket entry and the second number providing a pin citation. Documents in the Short Appendix and Separate Appendix are cited as "App.___" and "Sep.App.___," respectively.

[2] Sep.App.2 (¶1); *see also* App.33.

[3] Sep.App.2 (¶2); *see also* App.33.

[4] Sep.App.2 (¶2).

[5] App.33–34.

[6] *See* Sep.App.2 (¶2).

[7] *See id.*

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

While Sorensen slept, the Subaru's owner filed a police report.[8] The owner explained that his car had been stolen, and he alerted the police that there was a .38 Smith & Wesson revolver tucked in the driver's side door.[9] In response, the police began searching the area.[10]

Sorensen, oblivious to the police report and the gun, awoke in the Subaru the next day. He picked up his on-again-off-again girlfriend, Brandolyn Charles, and they ate an early lunch at Texas Roadhouse at about 11:00 a.m.[11] Over lunch, they had a lengthy conversation about their son and trying to make their relationship work.[12] At approximately 12:50 p.m., Sorensen and Charles got back in the Subaru.[13]

At that point, for the first time, Sorensen noticed the gun and was immediately alarmed.[14] In his words: "I knew since I became a felon, I was not allowed to have a gun and I haven't had one. I had heard from others that a felon-in-possession of a gun charge carries a mandatory 10-year sentence. . . . *I wanted nothing to do with guns*."[15] Put differently, Sorensen had no intention of keeping the gun. Although scared of the potential consequences of accidentally possessing one, he stayed calm and acted

---

[8] R.51:4 (¶¶7–8); R.22-9.
[9] R.51:4 (¶7).
[10] *See* R.22-9.
[11] *See* Sep.App.2 (¶¶3–4) (Sorensen called Charles "[a]round 10:30 a.m.," drove to pick her up, then drove about ten minutes to Texas Roadhouse).
[12] R.22:4.
[13] *Id.* at 11; Sep.App.2 (¶5).
[14] Sep.App.2 (¶5).
[15] *Id.* (emphasis added).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

rationally. He drove less than a mile to a nearby Kohl's parking lot, where his broken-down car was parked, to think through the best next steps.[16]

### B. Sorensen took immediate, reasonable steps to get rid of the gun safely by trying to surrender it to Eau Claire County's Restorative Justice Program.

Sorensen's mind went through a rolodex of options for disposing of the gun in a safe and reasonable way. He knew he couldn't give the gun to Charles, because she had a felony record.[17] Nor did he want to "leav[e] the gun unattended in the car," where Charles might find it.[18] He also considered "abandoning the gun[,] but that didn't seem safe."[19] Instead, he knew he needed to find someone to whom he could surrender the gun without risking anyone's safety. He soon realized that "the community center at the Goodwill [was] on the other side of the parking lot," and he recalled that there was a drop box there "for illegal stuff you want to dispose of without involving the police."[20] He resolved to take the gun there.

The Goodwill in Eau Claire serves both as a second-hand store and a community center.[21] Eau Claire County's Restorative Justice Program, housed in the Goodwill store, holds itself out to be a center for "heal[ing] and empower[ing] all participants" who come into contact with crime—victims, offenders, and the community alike.[22] To that end, it advertises that offenders can come to the Program to "show they are accountable for their

---

[16] *Id.* (¶6).
[17] *Id.* (¶5).
[18] *Id.* (¶6).
[19] *Id.*
[20] *Id.* at 2–3 (¶6 & Suppl. A).
[21] *Id.* at 2 (¶6).
[22] R.22-3.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

actions and make reparations for the harm that was caused."[23] And it hosts numerous services, including (but not limited to) accountability mentoring sessions, peace circles, and cognitive behavior intervention workshops.[24] These meetings take place in two rooms—a Wellness Room and a Restorative Justice Room (collectively, the community center). The rooms are well marked and located in the back of the Goodwill store, as shown in this floorplan[25]:



---

[23] *Id.* at 1.

[24] *Id.* at 2; R.22-4; *see Accountability Mentoring*, GOODWILL, https://tinyurl.com/3ebm5cee (last visited Nov. 3, 2022); *Peace Circles*, GOODWILL, https://tinyurl.com/3x4ybfpc (last visited Nov. 3, 2022).

[25] R.22-5; *see also* R.22-6; R.22-7.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Sorensen walked into the Goodwill with the gun in his pocket and headed to the community center. He wanted "to find someone who seemed like they were in charge" so he could "turn over the gun without scaring anyone."[26] He walked by the doors to the Wellness and Restorative Justice Rooms, but both were shut and appeared occupied.[27] He recognized that interrupting an ongoing meeting by pulling out a gun (to surrender it) would cause "a scene."[28] So, like any reasonable person, he waited.

For the next twenty-five minutes, Sorensen repeatedly tried to safely surrender the gun to someone in the community center. First, he lingered near the community center's doors to see if anyone exited, indicating the meeting had ended.[29] After a few minutes, he "milled around the store and talked with [Charles] while keeping an eye on this area so [he] could return and get rid of the gun."[30] Then, impatient and nervous, he entered the Wellness Room, but the meeting was ongoing, so he quickly left.[31] After he took another lap around the store, he looked in the window of the Restorative Justice Room; it was still occupied.[32] Under these circumstances, Sorensen believed he couldn't hand over the gun safely.[33]

---

[26] *Id.* Sep.App.4 (¶9).
[27] *See* Sep.App.4 (¶¶7–8).
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] R.22-8C at 33:51–33:57.
[32] *See* R.22-5; R.22-8C at 35:02 (looks in Restorative Justice Room window).
[33] *See* R.22-8C at 10:40 (first approaches community center); *id.* at 33:51 (enters Wellness Room); *id.* at 35:02 (looks in Restorative Justice Room window).

Federal Defender Services
of Wisconsin, Inc.

### C.    When Sorensen couldn't safely dispose of the gun, he left it on a shelf, brought the police back to find it later, and then was indicted.

The situation quickly devolved. After seeing the Subaru in the parking lot, police officers entered the Goodwill.[34] Sorensen had overheard Charles "talking to police officers" and, believing that "they were arresting her[, he] panicked."[35] He still couldn't surrender the gun to someone in the community center, because each room remained occupied. So, he "hid the gun on the back of a shelf near some electronics."[36] Sorensen thought it unlikely that any shopper would find it there; instead, he "hoped an employee might find it when restocking and [that] they would bring it to the community center."[37] Meanwhile, he hid in a utility closet, and then he ran out of the store.[38]

The police soon caught up with Sorensen. In a post-arrest interview, he told the officers that "when he realized the gun was in the car, he knew he could not be in possession of it" and took steps to dispose of it safely.[39] He then explained to the officers where they could find the missing gun and took them directly to where he had left it.[40] Months later, a grand jury indicted Sorensen for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).[41]

---

[34] *See* R.51:4 (¶9); Sep.App.4 (¶10).
[35] Sep.App.4 (¶10).
[36] *Id.* at 5 (¶11).
[37] *Id.*
[38] R.22-8C at 35:27–35:31; R.51:4 (¶10).
[39] *See* R.51:5 (¶11) (cross-referencing affidavit (Sep.App.1–6)).
[40] *Id.* (¶¶11–12).
[41] R.2.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**D.    Sorensen's theory of the case depended on an affirmative innocent possession defense.**

Before trial, Sorensen sought to raise an affirmative innocent possession defense. This defense seeks to excuse liability when a prohibited person comes into contact with a firearm "innocently"—i.e., inadvertently, unintentionally, or by mistake—and takes immediate, reasonable steps to surrender it. Sorensen's situation fit that description. After all, he had no intention of gaining possession of a firearm; he had just found it in the car. And he had immediately taken steps to surrender it in a safe and reasonable manner. Accordingly, Sorensen moved *in limine* to present that defense and to have the court instruct the jury consistent with his theory.[42]

That request now is the focus of this appeal. As such, it's worthwhile to pause here and present the background on which Sorensen's motion rested. As set out below, it's the judiciary's responsibility to identify what affirmative defenses are available to a defendant. The Circuits are split over whether a defendant may raise an affirmative innocent possession defense to a § 922(g) charge. This Court has yet to pick a side.

1.    *Courts identify affirmative defenses by consulting the statute's text, common-law principles, common sense, and state court practice.*

First principles of criminal law dictate that "wrongdoing must be conscious to be criminal." *Elonis v. United States*, 575 U.S. 723, 734 (2015). Put differently, the criminal law intends to punish "a vicious will." *Rehaif v. United States*, 139 S. Ct. 2191, 2196 (2019) (quoting 4 W. Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 21 (1769)); *accord*

---

[42] R.22:1. The parties don't dispute that Sorensen had a prior felony conviction at the time or that he was aware that that conviction was a felony. *See* R.51:6 (¶15).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

*Morissette v. United States*, 342 U.S. 246, 250–51 & nn.4–8 (1952) (collecting sources). For this reason, when courts "interpret criminal statutes, [they] normally start from a longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state." *Ruan v. United States*, 142 S. Ct. 2370, 2377 (2022) (quoting *Rehaif*, 139 S. Ct. at 2195).

Affirmative defenses follow from these first principles. They provide a defendant with an opportunity to demonstrate that his conduct doesn't warrant punishment, even if a prosecutor proves the elements of the offense, because he lacked a "vicious will." Put differently, affirmative defenses "do[] not controvert any of the elements of the offense itself"; rather, they "excuse conduct that would otherwise be punishable." *Dixon v. United States*, 548 U.S. 1, 6–7 (2006).

It is the judiciary's responsibility to recognize affirmative defenses to federal crimes. As the Supreme Court has directed: "it is up to the federal courts to effectuate the affirmative defense . . . as Congress may have contemplated it in an offense-specific context." *Id.* at 17 (internal quotation marks omitted). In this way, each branch has a hand in crafting to whom the law applies and when: the legislature "specif[ies] the prohibition and allow[s] exceptions"; the executive "declin[es] to prosecute (or [absolves] by pardon after conviction)"; and the judiciary "develop[s] defenses." Hon. Frank Easterbrook, *The Case of the Speluncean Explorers: Revisited*, 112 HARVARD L. REV. 1913, 1913–14 (1999); *accord United States v. Baker*, 523 F.3d 1141, 1142 (10th Cir. 2008) (McConnell, J., dissenting from denial of rehearing en banc).

10

To determine whether a claimed affirmative defense exists, courts begin with the statute's text. If Congress wanted to limit the judiciary's ability to recognize an affirmative defense, then it must have done so explicitly. *See Dixon*, 548 U.S. at 17; *see also* Easterbrook, 112 HARVARD L. REV. at 1914. The corollary of this principle is that statutory silence is not evidence that an affirmative defense has been excluded. *Dixon*, 548 U.S. at 17. Indeed, as the Fifth Circuit has noted, "statutes rarely enumerate the defenses to the crimes they describe." *United States v. Panter*, 688 F.2d 268, 271–72 (5th Cir. 1982) (interpreting § 922(g)(1)'s predecessor statute, 18 U.S.C. § 1202(a)(1), to permit affirmative defense of self-defense). Thus, a statute need not mention an affirmative defense for one to exist.

Beyond the statute's text, the judiciary uses traditional tools of statutory interpretation when determining whether to recognize an affirmative defense and, if so, what it requires. In particular, courts "look[] to the common law," "common sense," and contemporaneous state practice as guides. *United States v. Waldman*, 835 F.3d 751, 754 (7th Cir. 2016) (first quote); *United States v. Singleton*, 902 F.2d 471, 472 (6th Cir. 1990) (second quote); *United States v. Mason*, 233 F.3d 619, 623–24 (D.C. Cir. 2001) (reviewing state law practice). For example, in *United States v. Bailey*, the Supreme Court consulted both common-law principles and state court practice in contemplating the requirements for an affirmative defense to a prison escape charge. 444 U.S. 394, 409–11 & n.8 (1980). Similarly, in *United States v. Kirby*, the Supreme Court looked to "common sense" in holding that there existed an unspoken "temporary delay" defense to an obstruction-of-the-mail

11

statute, such that the county sheriff would not be held liable when he lawfully arrested the mailman. 74 U.S. (7 Wall.) 482, 486–87 (1868). The Court admonished that "[a]ll laws should receive a sensible construction," and "[g]eneral terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence." *Id.* at 486.

This Court, too, has applied those first principles to identify affirmative defenses to federal criminal statutes and outline their requirements. For example, in *Waldman*, this Court looked to common-law principles and held that a prisoner can assert a self-defense argument to excuse liability under § 111 for using non-lethal force against a correctional officer, even absent a "threat of serious bodily injury or death." 835 F.3d at 755–56. Similarly, in *United States v. Dingwall*, this Court considered general principles of reasonableness, as well as state court practice, then held that it was possible to defend against a Hobbs Act robbery charge with a duress defense premised on battering and its effects. 6 F.4th 744, 746–47, 751–54 (7th Cir. 2021). In these cases and others, this Court upheld its responsibility to identify affirmative defenses and their demands.

> 2.   *The courts of appeals have split over whether to recognize an affirmative innocent possession defense to § 922(g).*

Whether an affirmative innocent possession defense is available to defend against a § 922(g) charge is a point of contention among the courts of appeals. Three circuits recognize some version of the defense, while five circuits have rejected it. The remainder

(including this Court) have yet to decide the issue.[43] This appeal asks the Court to enter the debate. Before doing so, it's helpful first to color-in the legal landscape.

The D.C. Circuit has held that a defendant may present an innocent possession defense to a § 922(g) charge. In *Mason*, the court drew on common-law principles, common sense, and state court practice to hold that a felon's possession of a firearm is excused if the jury finds that: "(1) the firearm was attained innocently and held with no illicit purpose and (2) possession of the firearm was transitory." 233 F.3d at 624. With respect to the latter element, the court explained that "transitory" possession means that, "in light of the circumstances presented, there is a good basis to find that the defendant took adequate measures to rid himself of possession of the firearm as promptly as reasonably possible." *Id.* It requires that the defendant's actions demonstrate both "the intent to turn the weapon over to the police and that he was pursuing such an intent with immediacy and through a reasonable course of conduct." *Id.*[44]

In contrast, five courts of appeals have rejected an innocent possession defense to § 922(g). In the Fourth, Eighth, Ninth, Tenth, and Eleventh Circuits, a defendant may not

---

[43] The Second and Third Circuits have sidestepped the issue. *E.g.*, *United States v. Johnson*, 816 F. App'x 604, 609 (2d Cir. 2020) (per curiam); *United States v. Langforddavis*, 454 F. App'x 34, 36–37 (3d Cir. 2011). The Fifth Circuit has held that there is a "general availability of common-law defenses to a felon-in-possession charge," but it has not yet acknowledged an innocent possession defense. *United States v. Ortiz*, 927 F.3d 868, 874–77 (5th Cir. 2019) (internal quotation marks omitted).

[44] The First and Sixth Circuits also have acknowledged an innocent possession defense, but each takes a different approach. The First Circuit has not fully fleshed out the defense's elements. *See United States v. Baird*, 712 F.3d 623, 629–31 (1st Cir. 2013) (citing *United States v. Teemer*, 394 F.3d 59, 64–65 (1st Cir. 2005); *Mason*, 233 F.3d at 624). The Sixth Circuit has held that the defense is available in name, but it hasn't articulated a standalone test; a defendant must demonstrate duress *plus* other requirements. *E.g.*, *United States v. DeJohn*, 368 F.3d 533, 545–46 (6th Cir. 2004).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

seek a jury instruction that he possessed the firearm solely for the purpose of disposing

of it safely. As discussed at greater length below, these courts mistakenly believe that

Congress needed to expressly articulate the defense for it to exist and, in any event, that

the text Congress chose for § 922(g) doesn't leave room for it. *See United States v. Becerra*,

958 F.3d 725, 730–31 (8th Cir. 2020); *United States v. Vereen*, 920 F.3d 1300, 1306 (11th Cir.

2019); *United States v. Baker*, 508 F.3d 1321, 1325 (10th Cir. 2007); *United States v. Johnson*,

459 F.3d 990, 996 (9th Cir. 2006); *United States v. Gilbert*, 430 F.3d 215, 218–20 (4th Cir.

2005).

The question remains open here. This Court has yet to recognize an independent

innocent possession defense. *United States v. Cherry*, 921 F.3d 690, 692 (7th Cir. 2019). At

the same time, it has indicated that, were it do so, it would adopt the D.C. Circuit's two-

part test. *See United States v. Hendricks*, 319 F.3d 993, 1007 (7th Cir. 2003) (citing and

quoting *Mason*, 233 F.3d at 624, for possible requirements); *see also United States v. Jackson*,

598 F.3d 340, 350 (7th Cir. 2010) ("an innocent possession instruction is not warranted"

unless the defendant "immediately seek[s] to turn a firearm over to law enforcement").

### E.    The district court denied the defense's motion *in limine*, and Sorensen entered a conditional guilty plea that permits this appeal.

On that legal landscape, the district court denied Sorensen's motion. It

acknowledged that the Seventh Circuit has yet to recognize a standalone innocent

possession defense.[45] But, even assuming such a defense exists and all the facts proffered

were true, the court reasoned, Sorensen couldn't satisfy the hypothetical requirements

---

[45] *See* App.1.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

for the defense.[46] He had not sought to turn the gun into the police, directly. Nonetheless, the court held that the defense had preserved the issue for appellate review, and the Seventh Circuit could determine both whether to recognize the defense and its requirements.[47]

Given that ruling, the case was resolved short of trial. Sorensen entered a conditional guilty plea. If the Seventh Circuit recognizes the affirmative defense, then he may return to the district court to withdraw his guilty plea and proceed to trial.[48]

In assessing the factual basis for the plea and imposing its sentence, the court relied on the facts discussed above. It reasoned that it could accept the plea because Sorensen had admitted to "tak[ing] control of the gun and tak[ing] it from the car and put[ting] it in the Goodwill store."[49] But the court also recognized that Sorensen "did not seek out the firearm and there is no evidence that he used, or even intended to use it."[50] It then ordered him to serve 34 months in prison—roughly one month for each minute he held the firearm while trying to surrender it.[51]

This appeal timely followed.[52]

---

[46] *Id.*
[47] *See id.*
[48] R.51:3 (¶4); App.48.
[49] App.21.
[50] R.43:5.
[51] App.44–46.
[52] R.48.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

## SUMMARY OF THE ARGUMENT

Reasonableness informs whether innocent possession of a firearm is an affirmative defense to § 922(g). In answering that question, this Court must identify society's expectations for responding to the unexpected, evaluate what qualifies as a reasonable response, and determine whether Congress contemplated excusing from criminal liability those who tread that path. In other words, the Court must identify what is reasonable and whether Congress meant to punish reasonable behavior.

Here, the traditional tools point in favor of recognizing an innocent possession defense to § 922(g). Congress did not draft a strict liability offense. And it is reasonable to believe that when Congress criminalized the act of knowingly possessing a firearm, it contemplated excusing those who acted inconsistent with the ordinary meaning of "possess" and without a "vicious will"—holding a firearm only so long as to get rid of it safely. What's more, state courts that contemporaneously parsed similarly worded laws also recognized an innocent possession defense. They, too, looked at the ordinary meaning of "possess" and applied it in a common-sense way to excuse temporary, innocent, and reasonable possession.

Ultimately, of course, it will be up to this Court to articulate the defense's elements, but reasonableness must remain the north star. The defense respectfully suggests that this Court generally adopt the D.C. Circuit's test for an innocent possession defense—demand that a defendant prove that he obtained a firearm innocently and that he took immediate, reasonable steps to surrender it safely. But, in light of the difficult relationship

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

between some police and the communities they serve, the defense submits that the defense must allow for surrender of firearms to a wider circle of third-party actors than just law enforcement. Other individuals are in a position to safely accept firearms and take them to the police. And a defendant can act reasonably by turning to those liaisons for assistance.

Applying that test to the facts proffered here, it is plain that this case must be remanded. The evidence supports an innocent-possession defense theory. Sorensen knew he wasn't permitted to have a gun, he had no interest or desire in having a gun, and he was shocked when he found a gun tucked in the car door. But he acted immediately and reasonably in trying to surrender the gun at the Goodwill community center. Before Sorensen is made to spend years of his life incarcerated, he should be permitted to put on this innocent-possession evidence at a trial, and a jury should be permitted to evaluate it.

Thus, the defense requests that the Court reverse and remand this case.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

## ARGUMENT

### I.     Innocent possession is an affirmative defense to a § 922(g) charge.

Although this appeal does not present an issue of first impression, it will provide the first answer to a long-open question: In this Circuit, may a defendant present an affirmative innocent possession defense to a § 922(g) charge?

For all the reasons set forth below, the defense contends that the answer is Yes. This Court "review[s] *de novo* a district court's refusal to allow a defendant's theory of defense and the corresponding jury instruction." *Jackson*, 598 F.3d at 345. On that clean-slate review, this Court should conclude that § 922(g)'s plain text leaves room for affirmative defenses, and the combination of common-law principles, common sense, and background state practice weighs in favor of recognizing an innocent possession defense. Further, in recognizing this defense and identifying its elements, the Court should make reasonableness the lodestar, just as it is for other affirmative defenses.

### A.     The text of § 922(g), informed by the common law, common sense, and state practice, supports recognition of an innocent possession defense.

Congress enacted an early version of the felon-in-possession statute near the end of the Great Depression and revised it over the next fifty years to reach its present form. In 1938, it became unlawful for anyone "convicted of a crime of violence" or who qualified as a "fugitive [sic] from justice" to receive a firearm or ammunition that had been shipped in interstate commerce, with "possession" providing "presumptive

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

evidence" of guilt.[53] Two decades later, Congress replaced "crime of violence" with "crime punishable by imprisonment for a term exceeding one year."[54] And, a few years after that, Congress created an affirmative felon-in-possession crime. In 1968, Congress made it unlawful for "[a]ny person who has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony" to "possess[] . . . a firearm."[55] In 1986, Congress moved the relevant language to § 922(g)(1), where it took its familiar form.[56] Today, the law prohibits "any person who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year" from "knowingly" "possess[ing] . . . any firearm[.]" 18 U.S.C. §§ 922(g)(1), 924(a)(8).

In its choice of language for § 922(g)(1), Congress left room for affirmative defenses. It didn't create a strict liability offense. Rather, the statute contains an express scienter requirement: "knowingly." That requirement demands that the Government prove a defendant not only knew that he possessed a firearm, but also knew that he held the requisite prohibited status. *Rehaif*, 139 S. Ct. at 2196. What's more, Congress didn't articulate any affirmative defenses to § 922(g) or otherwise expressly preclude them; it stood silent. Consistent with that silence and its responsibility to recognize affirmative

---

[53] Federal Firearms Act, Pub. L. 785, § 2(f), 52 Stat. 1251 (1938), *codified at* 15 U.S.C. § 902, https://tinyurl.com/2dtsbmut.

[54] An Act to Strengthen the Federal Firearms Act, Pub. L. 87–342, § 2, 75 Stat. 757 (1961), *amending* 15 U.S.C. § 902, https://tinyurl.com/yxufterv.

[55] *See* Title VII of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. 90-351, § 1202, 82 Stat. 236, *codified at* 18 U.S.C. App. § 1202(a)(1), https://tinyurl.com/rbj4c8rh. Congress simultaneously repealed the Federal Firearms Act. *See id.* § 906, 82 Stat. 234.

[56] *See* Firearm Owners' Protection Act, Pub. L. 99–308, § 102(6), 100 Stat. 452 (1986), https://tinyurl.com/23ehyx6x. Congress simultaneously repeated the language that had been codified at 18 U.S.C. App. § 1202. *See id.* § 104(b), 100 Stat. 459.

19

defenses, this Court already has acknowledged three affirmative defenses to § 922(g)—duress, necessity, and self-defense. *See, e.g.*, *United States v. Perez*, 86 F.3d 735, 737 (7th Cir. 1996) (necessity); *United States v. Toney*, 27 F.3d 1245, 1248–49 (7th Cir. 1994) (duress); *United States v. Elder*, 16 F.3d 733, 738–39 (7th Cir. 1994) (self-defense).

As set out next, it is equally apparent that an affirmative innocent possession defense to § 922(g) exists. This Court need only hew to the ordinary meaning of the statute's key term—"possess"—and couple it with common sense, common-law principles, and the guidance of contemporaneous state court practice to conclude that Congress "may have contemplated" that defense and that this Court should recognize it. *See Dixon*, 548 U.S. at 17.

1.     Before and throughout the period when Congress was legislating, the ordinary meaning of "possess" spoke to a concept at odds with briefly handling an object in order to dispose of it. In the mid-nineteenth century, the ordinary person who consulted a dictionary would learn that "possess" means "[t]o have as an owner, to be master of[.]" *Possess*, Dictionary of the English Language 3002 (Johnson ed. 1877); *accord Possess*, Dictionary of the English Language 576 (Bolles ed. 1853). A century later, "possess" continued to describe holding something as though owning it; "[t]o have as belonging to one; own." *Possess*, Webster's New World Dictionary 1140 (Coll. ed. 1962); *accord Possess*, Webster's New International Dictionary 1926 (2d ed. 1934) ("to have and hold [something] as property") (as quoted in *United States v. Smith*, 997 F.3d 215, 221 (5th Cir. 2021)). In fact, *Black's Law Dictionary* notes that, by 1975, a few years

Federal Defender Services
of Wisconsin, Inc.

before Congress enacted § 922(g) in its modern form, "temporary innocent possession" warranted its own entry; it referred to "[t]he inadvertent possession of something prohibited, . . . esp. when, upon discovery, the possessor intended to turn it over to the police." *See Possession*, BLACK'S LAW DICTIONARY (11th ed. 2019) (dating entry to 1975). These entries make clear that, throughout the twentieth century, representatives in Congress (just like the average dictionary reader) would have understood "possess" to refer to holding onto something as though its owner or, at least, its master—not temporarily and for the sole purpose of surrendering it.

This ordinary meaning of "possess" continues to inform § 922(g). Congress chose to criminalize "possession" of a firearm without defining that term, leaving its ordinary, fixed meaning in place. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 69, 78 (2012) (ordinary-meaning and fixed-meaning canons). And this Court must consider "possess" in light of "how an ordinary person . . . might describe" it "*and how she would not.*" *See Wooden v. United States*, 142 S. Ct. 1063, 1069 (2022) (emphasis added). Recognizing an affirmative innocent possession defense does just that by excusing conduct *inconsistent* with the ordinary person's understanding of what it means to "possess" a firearm. After all, when a person takes hold of a gun temporarily and solely to surrender it, no one would think that he has acted consistent with owning the gun or claiming it as his property. Indeed, he is doing the *opposite*.

2.    Common sense and common-law principles also weigh in favor of reading § 922(g) to excuse temporary and innocent possession. In crafting the statute, Congress

deliberately chose *not* to create a strict liability offense. It makes little sense to read the statute in a manner that tilts towards strict liability by penalizing a purely technical violation of its letter, committed without a "vicious will." Instead, "possess" should receive a "sensible construction," consistent with the ordinary person's understanding — that is, one that avoids "injustice, oppression, or an absurd consequence." *See Kirby*, 74 U.S. (7 Wall.) at 486–87. As the Supreme Court has reasoned, "common sense accepts the ruling" that, although the law prohibits prisoners from escaping prison, that prohibition "does not extend to a prisoner who breaks out when the prison is on fire — for he is not to be hanged because he would not stay to be burnt." *Id.* at 487 (internal quotation marks omitted). It is "a like common sense" that should excuse liability under § 922(g) for the temporary possession of a firearm solely to surrender it reasonably and safely — he should not be punished for briefly holding a firearm in order to hand it to someone else. *Cf. id.*

3.      Contemporary state court practice reinforces reading § 922(g) to permit an innocent possession defense. Several state courts recognized such a defense to state unlawful-possession statutes in the years leading up to enactment of the federal law and during the period when Congress was refining it. When Congress first acted in 1938, at least Iowa, Texas, and New York had already recognized that someone with an "innocent or lawful purpose" would have a "good defense" to prosecution for unlawfully carrying a firearm. *State v. Williams*, 29 N.W. 801, 801–02 (Iowa 1886); *see, e.g.*, *People v. La Pella*, 4 N.E.2d 943, 943 (N.Y. 1936) (per curiam) (citing *People v. Persce*, 97 N.E. 877, 878 (N.Y. 1912)); *Fuller v. State*, 126 S.W. 569, 569 (Tex. Ct. Crim. App. 1910). By 1968, when

Congress created the predecessor to § 922(g)(1), Kansas also had recognized an innocent possession defense, and Oregon anticipated recognizing the same. *E.g.*, *State v. Phinis*, 430 P.2d 251, 259 (Kan. 1967); *State v. Cartwright*, 418 P.2d 822, 829 (Or. 1966). And, by 1986, when Congress moved the relevant language to § 922(g)(1), the District of Columbia had joined the chorus of states that recognized this defense, and California followed shortly thereafter. *Hines v. United States*, 326 A.2d 247, 248 (D.C. 1974); *People v. Hurtado*, 47 Cal. App. 4th 805, 813–14 (Cal. Ct. App. 1996) (applying "temporary possession for disposal" defense, recognized in 1971 with respect to narcotics, to felon-in-possession statute).

An everyday understanding of "possession" underpins these rulings. By way of example, in *Phinis,* the Supreme Court of Kansas reviewed a defendant's conviction under a state law that made it "unlawful for any person who has previously been convicted . . . [of enumerated crimes] . . . to keep a pistol in his possession, or under his control[.]" 430 P.2d at 258. After consulting dictionary definitions of "possess," the court determined that the statute "contemplates proof of possession and control which is more than an innocent handling of the pistol without intent to have, possess or control the same." *Id.* at 259. Although the court concluded that the evidence presented in that case was sufficient for conviction, its analysis made clear that the jury had been properly instructed when it was told: "if the handling [of a weapon] was an innocent one without the intent to have, possess or control the weapon[, then] such act was not prohibited by the statute." *See id.* at 258.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Common sense also informed these state court rulings. For instance, in *Fuller*, the Texas Court of Criminal Appeals was asked to review a defendant's conviction for "unlawfully carrying on and about his person a pistol." 126 S.W. at 569. The defendant's claim was that, when he saw a pistol on the seat of a buggy in which he had just been traveling with a marshal, he "carried the pistol from the buggy to the house, some 18 or 20 feet, and gave it to" the marshal because "he thought the [marshal] had forgotten [it]." *Id.* The appellate court concluded that the trial court erred when it refused to give an innocent possession instruction. Little analysis was needed. The court simply explained that, if the defendant's "possession [of the pistol] was momentary, and for an innocent purpose, and in aid of a person authorized to carry [the] same," then the defendant would not be liable. *Id.*

4. Collectively, these guideposts provide good reason to think Congress "contemplated" an innocent possession defense to § 922(g). *See Dixon*, 548 U.S. at 17. Congress made a deliberate choice when it criminalized the "possession" of a firearm and didn't define that term in a technical way. Thus, the ordinary, fixed meaning of "possess" controls. And common sense and common-law principles support reading that term, and the statute as a whole, to permit the jury to excuse someone who acted swiftly and reasonably to surrender an unintentionally acquired gun. What's more, just as state courts "have allowed an innocent possession defense to a weapons possession charge," Congress may have contemplated that federal courts would read § 922(g) to allow for a similar defense. *See Mason*, 233 F.3d at 623–24 (collecting state court rulings in support of

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

recognizing innocent possession defense. And, regardless of Congress's actual awareness of these state court rulings, they provide general support for recognizing the defense as to § 922(g). They align with the ordinary understanding of "possess." And they endorse a common-sense reading of the statute—one that accords with punishing only those who act with a "vicious will."

Importantly, there is no text-based justification for permitting some common law defenses to § 922(g), but not others. As noted above, this Court already has recognized three affirmative defenses to § 922(g) allegations. *See Perez*, 86 F.3d at 737 (necessity); *Toney*, 27 F.3d at 1248–49 (duress); *Elder*, 16 F.3d at 738–39 (self-defense). Congress did not expressly make any of those three defenses available. Instead, following standard practice, this Court acknowledged those defenses because they weren't prohibited by the language Congress chose. Thus, there is no textual barricade to acknowledging *other* affirmative defenses. *See Baker*, 508 F.3d at 1331 (Holloway, J., dissenting).

Meanwhile, to reject an affirmative innocent possession defense would contravene the first principles of equity embedded in the common law. If a defendant could be held criminally liable for possessing a firearm without possessing the requisite "vicious will," then it would "radically [] change the weights and balances in the scales of justice." *See Morissette*, 342 U.S. at 263. It would be inconsistent with the ordinary person's understanding of "possess." And it would be in tension with Congress's decision *not* to enact a strict liability offense. Indeed, to reject that defense "is to say that a felon-in-possession *always* will be guilty once he knowingly possesses a weapon, without regard

Federal Defender Services
of Wisconsin, Inc.

to how or why he came into possession or for how long possession was retained." *Mason*, 233 F.3d at 623 (emphasis in original). That is a "harsh and absurd result" that Congress couldn't have intended. *Id.* For these very reasons, the D.C. Circuit "[could ]not imagine" declining to recognize the defense. *Id.* And, tellingly, in other cases, the Government has *agreed* that an innocent possession defense exists. *E.g., id.* at 623 (§ 922(g)(1)); *Baird*, 712 F.3d at 629 (§ 922(j)). This Court should join the D.C. Circuit in recognizing an innocent possession defense.

**B.     Those courts that have declined to recognize an affirmative innocent possession defense have done so based on faulty reasoning.**

Five courts of appeals disagree with the defense's position here, but this Court shouldn't be persuaded to follow their lead. Those decisions stem from a misunderstanding of *who* is responsible for identifying affirmative defenses, a misreading of the statutory text, and an elevation of purpose over practice. Each court's reasoning suffers from at least one flaw; some suffer from two or three. These errors are worth fleshing out so that the Court can confidently set this group of cases aside and join the D.C. Circuit.

1.     To begin, several courts that have rejected an innocent possession defense have done so based on a confused understanding of which branch of government is responsible for articulating an affirmative defense. The Eighth, Ninth, and Tenth Circuits mistakenly assumed that *Congress* must expressly create an affirmative defense in order for one to exist. *See Becerra*, 958 F.3d at 731 ("If Congress had wanted to create another safety valve [other than the mens rea requirement], it certainly knew how."); *Johnson*, 459

F.3d at 997 ("Congress knows how to create an affirmative defense when it wishes to do so."); *Baker*, 508 F.3d at 1327 ("Congress could have created the defense had it seen fit to do so."). But that is contrary to binding precedent. As the Supreme Court has explained, in the face of Congressional silence as to whether an affirmative defense exists, it the *judiciary*'s obligation to identify those defenses. *Dixon*, 548 U.S. at 17; *see also* Easterbrook, 112 HARVARD L. REV. at 1914.

2.     Separately, several courts that reject an innocent possession defense do so by mistakenly placing great weight on Congress's decision to criminalize the "knowing" possession, rather than the "willful" possession, of a firearm. For example, the Eleventh Circuit determined that, "by omitting the element of willfulness from § 922(g)(1), Congress necessarily foreclosed the availability of the innocent transitory possession defense." *See Vereen*, 920 F.3d at 1308. The Fourth, Ninth, and Tenth Circuits agree. *See Gilbert*, 430 F.3d at 219 (if Congress had intended an affirmative innocent possession defense to exist then "it would have required a willful violation of the statute, rather than merely a knowing one"); *Johnson*, 459 F.3d at 996 ("only the 'willfully' mens rea invites inquiry into whether the defendant had bad motive or intent"); *Baker*, 508 F.3d at 1325 ("by prohibiting knowing possession, the statute does not invite inquiry into the reason the defendant possessed the [firearm]"). Put differently, these courts view the mens rea element of the statute as precluding recognition of an innocent possession defense.

This reasoning suffers from two flaws. First, it confuses how an affirmative defense operates. The difference between "knowledge" and "willfulness" speaks to the

27

*elements* of the offense. Yet, an affirmative defense "does not serve to negate the necessary mens rea, but to excuse the crime even though the defendant was in knowing possession of the [firearm]." *See Baker*, 523 F.3d at 1143 (McConnell, J., dissenting). Put differently, the mens rea requirement that Congress chose outlines the Government's burden of proof; it says nothing about the availability of an affirmative defense. Second, deciding whether an affirmative defense is available based on Congress's use of "willfully," rather than "knowing," is in tension with *Dixon*. There, the Supreme Court did not differentiate between § 922(a)(6) (violation must be "knowing") and § 922(n) (violation must be "willful") in concluding that an affirmative defense was possible for both. *See id.* at 1143 (discussing *Dixon*, 548 U.S. at 6–7). There is no reason, then, to think that Congress's selection of "knowing" for § 922(g) precludes recognition of an affirmative innocent possession defense.

3.     Finally, and tellingly, a majority of the courts that have refused to acknowledge an innocent possession defense have done so based on thinly veiled policy preferences. The Fourth, Ninth, and Eleventh Circuits have explained that, if they were to recognize an innocent possession defense to § 922(g)(1), then it is possible that a defendant's "purpose would suddenly become an issue in a great number of cases," making it more difficult for the Government to obtain convictions. *Gilbert*, 430 F.3d at 219; *accord Vereen*, 920 F.3d at 1308; *Johnson*, 459 F.3d at 997. In turn, they assert, this would "thwart [Congress's] purpose" of "keep[ing] guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

to society." *Johnson*, 459 F.3d at 998 (first quote); *Vereen*, 920 F.3d at 1309–10 (second quote) (internal quotation marks omitted); *accord Gilbert*, 430 F.3d at 220. Relatedly, the Tenth Circuit has opined that no innocent possession defense is needed, because "sound prosecutorial discretion" will "safeguard against liability for being a Good Samaritan." *Baker*, 508 F.3d at 1327.

Yet, questions of statutory interpretation (like this one) can't be answered based on a preferred outcome. There is no avoidance-of-acquittals canon. Credibility assessments are the purview of the jury; "[i]t is for them, generally, and not for appellate courts, to say that a particular witness spoke the truth or fabricated a cock-and-bull story." *Bailey*, 444 U.S. at 414–15. A jury, then, is best positioned to assess a defendant's stated purpose in possessing a firearm. And the suggestion that prosecutors may serve as the gatekeepers of fundamental fairness is no solution at all. As Judge Holloway explained, dissenting from the Tenth Circuit's ruling, "prosecutorial discretion is hardly a panacea, or a guarantee of even-handed justice." *Baker*, 508 F.3d at 1331. For these very reasons, the Supreme Court has admonished that the judiciary "cannot construe a criminal statute on the assumption that the Government will use it responsibly." *Marinello v. United States*, 138 S. Ct. 1101, 1109 (2018) (internal quotation marks omitted).

What's more, these courts' concerns about "thwarting" the statute's purpose are misplaced. An innocent possession defense "does not offend the statute's goal of keeping guns out of the hands of convicted felons," because "it is the retention of a firearm, rather than the brief possession for disposal, which poses the danger" that Congress sought to

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

eliminate. *Mason*, 233 F.3d at 624–25 (cleaned up). Rather than undermine the statute's purpose, then, an innocent possession defense serves simply to excuse from liability those who do *not* pose the danger that concerned Congress.

*     *     *

The circuit split may appear lopsided, but the weight of sound reasoning tips the scales in favor of the D.C. Circuit's position. A straightforward read of the statute's text, reference to the common law and common sense, and consultation of state court practice compels recognition of an innocent possession defense to § 922(g). Given a modicum of scrutiny, the contrary rulings offer no persuasive reason to join them.

### C.    The Court should adopt a modified version of the *Mason* test.

This Court is best positioned to craft the elements of an innocent possession defense; given that "[t]his is no mean feat," though, a proposal may prove helpful. *See Mason*, 233 F.3d at 623. The defense suggests that the Court adopt a modified version of the D.C. Circuit's test, as follows:

> (i)     The defendant attained the firearm innocently (i.e., inadvertently, unintentionally, or otherwise by mistake) and held it with no illicit purpose;

> (ii)    Possession of the firearm was transitory, i.e.—in light of the circumstances, there is a good faith basis to find that the defendant took adequate measures to rid himself of possession of the firearm as promptly as reasonably possible;

> (iii)   *By delivering or attempting to deliver the firearm to someone who the defendant reasonably believed was in a position to safely surrender it to law enforcement.*

30

This proposal tracks the *Mason* test, which this Court anticipated adopting, while modifying (through a third element, in italics) the individual to whom the defendant must deliver the firearm. *Cf. Mason*, 233 F.3d at 624; *Hendricks*, 319 F.3d at 1007 (citing and quoting *Mason*). Rather than demand that the defendant intend to "turn the weapon over to the police," specifically and directly, the defense proposes that an innocent possession defense be available to a defendant who attempted to or did deliver the gun to someone he reasonably believed could surrender it to the police safely. *Cf.* 233 F.3d at 624.

As explained at greater length below, this proposal strikes the right balance. Reasonableness has been (and should remain) the lodestar in crafting an affirmative defense. And it is reasonable to identify a broader swath of individuals to whom a firearm can be turned over safely—particularly in light of the many pragmatic concerns individuals have about approaching police with guns.

To begin, whether a defendant acted *reasonably* under the circumstances is the touchstone of several affirmative defenses. For example, in the context of unlawful possession of a firearm, a defendant can claim necessity if he "*reasonably* believes" his conduct is necessary to avoid a more serious, imminent harm and "there are no *reasonable* legal alternatives to violating the law." *Elder*, 16 F.3d at 738 (emphasis added). Similarly, a defendant can claim self-defense if he demonstrates, *inter alia*, "no *reasonable* legal alternative []to both the criminal act and the avoidance of the threatened harm." *Id.* at 739 (emphasis added). As then-Judge Kavanaugh explained when speaking about the duress defense, a factfinder's focus is on "the *reasonableness* of a defendant's actions . . . [under]

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

the defendants' particular circumstances." *United States v. Nwoye (Nwoye II)*, 824 F.3d 1129, 1137 (D.C. Cir. 2016) (emphasis added and internal quotation marks omitted); *accord Dingwall*, 6 F.4th at 757. And juries historically assess reasonableness based on "factors that differentiate the actor from another, . . . as well as facts known to the defendant at the time in question." *Nwoye II*, 824 F.3d at 1137 (internal quotation marks omitted).

An innocent possession defense should acknowledge that a defendant can reasonably rely on numerous individuals to safely dispose of a firearm—not just the police. Many individuals are trustworthy and in a position to act as liaisons between the police and those trying to give up firearms safely and anonymously. For example, religious leaders, local community groups aimed at crime reduction, lawyers, health care providers, social workers, and others have established, positive relationships with the community. They are well-positioned to accept firearms, immediately call the police, and ensure those firearms are safely delivered to law enforcement. But that doesn't make the list of possible third-party liaisons endless. In the same way that the duress or necessity defense hinges on a defendant's *reasonable* belief under the circumstances, a defendant asserting an innocent possession defense should be required to establish that the person to whom he turned for assistance, if not the police, was someone he *reasonably* believed was in a position to safely surrender the firearm to the police.

Allowing the innocent possession defense to include reasonable third-party liaisons is important because individuals have good reason not to feel safe turning in a gun to the police. Intuitively, someone who recognizes that he is not supposed to have a

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

firearm is not inclined to volunteer that fact. *Cf.* U.S. CONST. amend. V. Beyond the fear of getting in trouble, though, there is a real fear of harm. More than 1,000 people have been shot and killed by police *in the past year alone*; since 2015, there have been more than 5,000 fatal shootings by on-duty police officers in the United States.[57] Indeed, headlines taken from just the last few months make the point.[58] For the innocent possession defense to require delivery of a firearm to a police officer, only, would be to condemn to conviction those without a "vicious will" who reasonably fear for their safety at the hands of the police.

This concern isn't hypothetical; defendants' fear of the police appears in the innocent possession case law itself. For instance, in *Jackson*, the defendant explained that he tried to rid himself of a firearm by giving it to his mother, rather than the police, "because of the Madison Police Department's antagonistic relationship with his family." 598 F.3d at 349 (internal quotation marks omitted). That case provides just one example of a broader phenomenon of distrust between the police and the public.

The defense's proposed test both accounts for these realities and better serves Congress's goal. The statute aims to "keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." *Small v. United States*, 544 U.S. 385, 393 (2005). This defense does just that: it

---

[57] *See Fatal Force*, WASH. POST, https://tinyurl.com/nhb2b7an (last updated Nov. 2, 2022).

[58] *E.g.*, Allison Garfield, *State agencies investigating fatal shooting by Dane County Sheriff's Office Deputy*, THE CAP TIMES, Oct. 17, 2022, https://tinyurl.com/yvz396ry; Steve Almasy et al., *Two Chicago Police officers face felony charges related to July shooting of unarmed man*, CNN (Sept. 17, 2022), https://tinyurl.com/2pd9ha9k; Timothy Bella, *After a Black man is killed by police, a city cancels its July Fourth celebration*, WASH. POST, July 1, 2022, https://tinyurl.com/33ju542f.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

incentivizes a felon who inadvertently comes into contact with a firearm to relinquish it immediately by excusing liability. In other words, it provides a pathway for keeping guns out of the hands of felons. And that goal is better accomplished by widening the circle of individuals to whom firearms may be surrendered. Meanwhile, restricting the defense to demand that a felon turn over a gun *only* to a police officer before he may claim innocent possession undermines the statute's goal. If that is the rule, then individuals who might otherwise be willing to immediately surrender an accidentally possessed gun may instead choose to retain it, rather than risk interacting with the police. *See also Waldman*, 835 F.3d at 755–56 (rejecting limitation on an affirmative self-defense argument that would undercut the defense's purpose).

## II. The proffered evidence warrants remand so that Sorensen may present an innocent possession defense theory to the jury.

The defense's ask in this appeal is narrow: recognize an affirmative innocent possession defense to § 922(g) and remand for further proceedings. The *availability* of an affirmative defense is a legal question for this Court. But its *viability* is a factual question for the jury. *See Mason*, 233 F.3d at 624.

It follows that the remaining analysis is necessarily limited. When a defendant appeals the denial of a motion *in limine*, this Court must credit his proffered evidence for purposes of the appeal. *See Dingwall*, 6 F.4th at 759; *see also United States v. Mayfield*, 771 F.3d 417, 420 (7th Cir. 2014) (en banc). And the district court will decide on remand, with the "actual evidence presented at trial," whether a jury instruction is warranted. *See Dingwall*, 6 F.4th at 761. A defendant is entitled to that instruction if: "(1) the instruction

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

is a correct statement of the law; (2) the evidence supports the theory of defense; (3) the defense is not part of the government's charge; and (4) the failure to give the instruction would deprive the defendant of a fair trial." *Cherry*, 921 F.3d at 692 (internal quotation marks omitted). A theory of defense "need only have some foundation in the evidence, however tenuous," to warrant an instruction. *Hendricks*, 319 F.3d at 1006 (internal quotation marks omitted); *see also Mayfield*, 771 F.3d at 443.

Sorensen's proffer to the district court supports further proceedings. For all the reasons discussed above, an affirmative innocent possession defense is a correct statement of the law and would not be part of the Government's charge. As set out below, Sorensen's proffered evidence supports his theory of defense, and, if the evidence were to come in at trial as proffered here, then failing to give the instruction would deprive Sorensen of a fair trial.[59]

First, the record reflects that Sorensen came into possession of the firearm innocently, by accident, and held it with no illicit purpose. As the district court recognized, he "did not seek out the firearm and there is no evidence that he used, or even intended to use it."[60] After all, it wasn't his gun, he knew he "was not allowed to

---

[59] The defense respectfully submits that application of the jury-instruction test to a case in this posture is premature. There was no trial in this case, and it will be the district court's job, on remand, to assess whether an instruction is warranted based on the actual evidence. *Dingwall*, 6 F.4th at 761; *accord id.* at 762–63 (Kirsch, J., concurring). The focus here, then, should be solely on whether the proffered evidence aligns with the innocent possession defense. But the jury-instruction test appears throughout the case law. *Compare, e.g., Cherry*, 921 F.3d at 692 (citing this test in appeal following jury trial), *with, e.g., Jackson* 598 F.3d at 349–50 (citing this test where defendant entered conditional guilty plea and appealed denial of pretrial motion regarding defense theory). In the interest of completeness, the defense addresses each prong of that test.

[60] R.43:4.

Federal Defender Services
of Wisconsin, Inc.

have a gun," and he "wanted nothing to do with guns."[61] When he picked up the firearm in the Subaru, he did so only to surrender it.

The fact that Sorensen found the gun in a stolen car doesn't change the analysis. For example, in *Hendricks*, the defendant was traveling in a stolen car and became aware of a handgun under the passenger seat sometime during the drive. 319 F.3d at 998. He subsequently was charged under § 922(g)(1) and sought to raise an innocent possession defense. *Id.* This Court explained that (assuming the defense existed) "the evidence was sufficient to create a triable issue of fact" over the first element—whether he had "attained [the firearm innocently] and held [it] with no illicit purpose." *Id.* at 1006–07 (internal quotation marks omitted). That fact pattern echoes this one: Sorensen was traveling in a stolen car and, at some point, became aware of a handgun in the driver's side door. It follows that, here, as in *Hendricks*, there is a triable issue of fact as to whether the first prong of the defense can be satisfied.

Second, Sorensen's possession of the firearm was transitory. Upon realizing the gun was in the car, Sorensen immediately wanted to distance himself from it. And he acted reasonably, not rashly—he knew he had to dispose of the gun *safely*. To that end, Sorensen kept the gun away from Charles, who he knew had a prior felony conviction and couldn't hold it, legally. And he didn't abandon the gun, which risked someone with illicit motives finding it or a child stumbling across it and getting hurt. Instead, he looked at the options immediately surrounding him, he remembered that the Goodwill (across

---

[61] Sep.App.2  (¶5).

36

the parking lot) had a community center with an anonymous drop box, and he took the gun there in order to surrender it.

Nor did Sorensen tarry in pursuing this reasonable course of action. He realized the gun was in the Subaru after lunch, at approximately 12:50 p.m.; he collected his thoughts; and he entered the Goodwill just a few minutes before 1:00 p.m. Then, for twenty-five minutes, Sorensen consistently tried to surrender the gun safely to someone in the community center without frightening anyone else in the store. In other words, there is a good basis to find that Sorensen took adequate measures to rid himself of the firearm as promptly as reasonably possible.

These facts echo those in *Mason*, which warranted jury evaluation. In that case, the defendant found the gun during his delivery route and resolved to take it to a law enforcement officer he knew at his next stop; he drove to that stop, as planned, but he neither called the police while en route nor delivered the gun to the first officer with whom he came into contact. 233 F.3d at 625. Nonetheless, the D.C. Circuit held that these facts presented a triable question "as to whether [the defendant] took the necessary steps to dispose of the gun with immediacy and through a reasonable course of conduct." *Id.* Similarly, here, there is a triable question as to whether Sorensen took the necessary steps to dispose of the gun promptly and reasonably.

Third, there is sufficient evidence that Sorensen attempted to deliver the gun to someone he reasonably believed could safely surrender it to law enforcement. The Goodwill in Eau Claire holds itself out to be a safe space where offenders can come to

37

take responsibility and account for their actions. And Sorensen recalled that the Goodwill contained a secure drop box for contraband. In light of these circumstances, it was reasonable for Sorensen to believe that he could seek out someone in charge there for assistance.

Finally, if the evidence were to come in at trial as proffered here, then failing to instruct the jury on innocent possession would deprive Sorensen of a fair trial. Innocent possession is the entire defense case. Sorensen contests liability not because the Government cannot prove the elements of his case, but because, under these particular circumstances, his conduct should be excused. There can be little doubt, then, that failing to give the instruction would "seriously impair[] [his] ability to present his defense." *See Baird*, 712 F.3d at 633 (vacating § 922(j) conviction and remanding where district court failed to instruct jury on innocent possession defense, which "was the only case [the defendant] put on"). And, in turn, precluding the jury from considering it would undermine the fairness of his trial.

Federal Defender Services
of Wisconsin, Inc.

## CONCLUSION

Sometimes, the unexpected happens, as it did to Steven Sorensen—he came into possession of a firearm accidentally, when he was not supposed to have one. But he reacted just as society hopes every person in his position would react. He calmly formed a plan to reasonably dispossess himself of the gun as quickly and safely as possible. Sorensen should have had the opportunity to present evidence and argue to a jury that his brief possession of a gun—while he tried to safely surrender it—is excusable. For all the reasons set forth here, this Court should recognize a standalone affirmative innocent possession defense and remand this case so that Sorensen may present it at trial.

Dated in Madison, Wisconsin, this 3rd day of November, 2022.

Respectfully submitted,

*/s/ Jessica Arden Ettinger*
Jessica Arden Ettinger
FEDERAL DEFENDER SERVICES
   OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin  53703
(608) 260-9900
jessica_ettinger@fd.org

*Counsel for Steven Sorensen*

**CERTIFICATE OF COMPLIANCE AND SERVICE**

Counsel for Steven Sorensen certifies that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B), as modified by Circuit Rule 32(c), because it contains no more than 14,000 words, excluding the parts of the document exempt by Federal Rule of Appellate Procedure 32(f). Specifically, the brief contains 10,128 words, as counted by the word-count feature of Microsoft Word.

Counsel further certifies that this document complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6), as modified by Circuit Rule 32. This document has been prepared in a proportionally spaced typeface using Book Antiqua, 12-point font (and 11-point footnotes), in Microsoft Word.

On this 3rd day of November, 2022, the foregoing document was filed electronically with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the Court's CM/ECF system, which will provide electronic service on all counsel of record.

*/s/ Jessica Arden Ettinger*
Jessica Arden Ettinger

*Counsel for Steven Sorensen*

**CIRCUIT RULE 30(d) STATEMENT**

Pursuant to Circuit Rule 30(d), counsel for Mr. Sorensen certifies that all the materials specified in Circuit Rule 30(a) and (b) are included in the Short Appendix that is attached to this brief.

Date: November 3, 2022                    _/s/ Jessica Arden Ettinger____
                                          Jessica Arden Ettinger

                                          *Counsel for Steven Sorensen*

**SHORT APPENDIX**

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

**INDEX TO SHORT APPENDIX**

Page

A-1: Order Denying Motion *in Limine*, October 21, 2021 ...............................................App.1

A-2: Transcript, Change-of-Plea and Sentencing Hearing, April 22, 2022 .................App.2

A-3: Judgment and Commitment Order (Redacted), April 22, 2022.........................App.51

FEDERAL DEFENDER SERVICES
of WISCONSIN, INC.

A-1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

                              Plaintiff,                          ORDER

          v.
                                                                 21-cr-56-jdp
STEVEN SORENSEN,

                              Defendant.

---

Defendant Steven Sorensen has filed a pretrial motion in which he seeks to present an "innocent possession" defense at trial. Dkt. 22. But he concedes that under the facts of his case, an innocent possession defense is plainly foreclosed by circuit precedent, specifically *United States v. Cherry*, 921 F.3d 690, 692 (7th Cir. 2019) and *United States v. Jackson*, 598 F.3d 340, 350 (7th Cir. 2010). Sorensen acknowledges that his motion must be denied; he makes the motion to preserve the opportunity to persuade the Court of Appeals to recognize an innocent possession defense.

ORDER

IT IS ORDERED that the motion by defendant Steven Sorensen to present an innocent possession defense, Dkt. 22, is DENIED.

Entered October 21, 2021.

                              BY THE COURT:

                              /s/
                              _____
                              JAMES D. PETERSON
                              District Judge

App.1

A-2

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

      Plaintiff,

 -vs-                      Case No. 21-CR-56-JDP

STEVEN SORENSEN,            Madison, Wisconsin
                               April 22, 2022
        Defendant.          9:06 a.m.

---

STENOGRAPHIC TRANSCRIPT OF PLEA AND SENTENCING HEARING
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

                  Office of the United States Attorney
                  BY:  COREY C. STEPHAN
                  Assistant United States Attorney
                  222 West Washington Avenue, Suite 700
                  Madison, Wisconsin  53703

For the Defendant:

                  Federal Defender Services of Wisconsin
                  BY:  ALEXANDER P. VLISIDES
                      JOSEPH A. BUGNI
                  22 East Mifflin Street, Suite 1000
                  Madison, Wisconsin  53703

Also appearing:  STEVEN SORENSEN, Defendant
                  JESSICA KOCH, U.S. Probation Officer

Jennifer L. Dobbratz, RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin  53703
(608) 261-5709

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 2 of 49
Case: 22-1801   Document: 15      Filed: 11/03/2022   Pages: 112

2

```
1              (Proceedings called to order at 9:06 a.m.)

2                   THE CLERK:  Case No. 21-CR-56, United States of America

3      v. Steven Sorensen, called for a plea and sentencing.

4           May we have the appearances, please.

5                   MR. STEPHAN:  Good morning, Your Honor.  The government

6      appears by Corey Stephan.

7                   THE COURT:  Good morning.

8                   MR. VLISIDES:  Good morning, Your Honor.  Alex Vlisides

9      and Joe Bugni on behalf of Mr. Sorensen.

10                   THE COURT:  Good morning.

11          So we're here for a combined plea and sentencing based on a

12      written plea agreement that's been provided to the Court.  We'll

13      begin with the plea portion of the hearing.

14          Mr. Vlisides, have you and Mr. Sorensen received a copy of

15      the indictment?

16                   MR. VLISIDES:  We have, Your Honor, and I will add

17      there's one maybe preliminary matter that we'd like to --

18                   THE COURT:  All right.

19                   MR. VLISIDES:  -- take up.  There was a pending motion

20      to supplement the defendant's motion in limine --

21                   THE COURT:  Yes.

22                   MR. VLISIDES:  -- that was never addressed by the

23      Court.

24                   THE COURT:  Okay.

25                   MR. VLISIDES:  And I do have --
```

```
 1              THE COURT:  So you want to add that affidavit to the

 2     motion, which you have conceded is not supported under Seventh

 3     Circuit law, right?

 4              MR. VLISIDES:  Correct, Your Honor.  And we have one

 5     additional change to that affidavit that I have a physical copy

 6     of, and so the hope would be just to submit that to the Court.

 7              THE COURT:  Is there any objection from the government

 8     to supplementing the motion?

 9              MR. STEPHAN:  I haven't seen it yet, so if I could see

10     it.

11              THE COURT:  Do you have another copy for me?

12              MR. VLISIDES:  I do not have the handwritten note on an

13     additional copy.

14              THE COURT:  I thought there was a handwritten notation

15     on the one that was on the docket.

16              MR. VLISIDES:  Yes, Your Honor.

17              THE COURT:  So is that what you're submitting or

18     there's more handwritten notations?

19              MR. VLISIDES:  Yes.

20              MR. STEPHAN:  So, I mean, this is just the same just

21     with the handwritten notation --

22              MR. VLISIDES:  Just that one handwritten notation,

23     yeah, is the only new addition.

24              MR. STEPHAN:  Actually, there's a couple.  Hold on.

25          All right.
```

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 4 of 49
Case: 22-1801   Document: 15   Filed: 11/03/2022   Pages: 112

4

```
1              MR. VLISIDES:  Your Honor, may I approach?

2              THE COURT:  Yes.

3              MR. VLISIDES:  And the blue ink on, I believe, the

4     second page is the new addition.

5              THE COURT:  Okay.  Does the government object to the

6     supplementation of the motion?

7              MR. STEPHAN:  No.  It's just his -- what he would

8     testify he believed.  I don't know if, in fact, there was a drop

9     box in there, but if he was going to testify that he believed it

10    was there, I guess that's his belief.

11             THE COURT:  Well, also the -- I haven't ruled on the

12    motion to supplement it at all, so it's not just the blue

13    handwritten notes, but it's, in fact, the entire affidavit that

14    is submitted in support of the motion in limine.

15         Does the government object to that?

16             MR. STEPHAN:  Are you referring to 22-1, Your Honor?

17    Or -- what was the one that had the black handwritten --

18             MR. VLISIDES:  28-1 was the -- 28 was the --

19             MR. STEPHAN:  I got it.

20         Your Honor, are you asking if I object to the acceptance of

21    that?

22             THE COURT:  Yeah, the entire affidavit.

23             MR. STEPHAN:  No.  I mean, that's what he'd testify to,

24    and I --

25             THE COURT:  Okay.  Because it's not objected to, I'll
```

Case: 3:21-cr-00056-jdp  Document #: 53  Filed: 05/10/22  Page 5 of 49
Case: 22-1801  Document: 15  Filed: 11/03/2022  Pages: 112

5

1    accept it, and so we'll just put this on the docket.

2              MR. VLISIDES:  Thank you, Your Honor.

3              THE COURT:  There you go.

4         Okay.  So I will allow the supplementation of that motion.

5    It doesn't change the ruling.

6         All right.  Are we ready to go with the plea hearing?

7              MR. VLISIDES:  Yes, Your Honor.  Thank you.

8              THE COURT:  Okay.  Would you like the indictment read?

9    Have you received a copy?

10             MR. VLISIDES:  I have received a copy, do not need the

11   indictment read.

12             THE COURT:  Mr. Stephan, would you state the penalties

13   that Mr. Sorensen would face if he were convicted?

14             MR. STEPHAN:  Yes, Your Honor.  Upon the expected plea

15   to the single count, the maximum penalties are ten years in

16   prison, a $250,000 fine, a three-year period of supervised

17   release, and a $100 special assessment.

18             THE COURT:  Mr. Vlisides, have you talked with Mr.

19   Sorensen about the charges he faces, the penalties that could

20   result, and whether he has any defenses?

21             MR. VLISIDES:  Yes, Your Honor.

22             THE COURT:  Mr. Sorensen, my understanding is that

23   you're prepared to enter a plea of guilty today; is that

24   correct?

25             THE DEFENDANT:  Yes, sir.

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 6 of 49
Case: 22-1801   Document: 15      Filed: 11/03/2022   Pages: 112

6

```
 1           THE COURT:  The purpose of this part of the hearing is

 2   to make sure that you're capable of proceeding, that your plea

 3   is truly voluntary, that you understand the charges that you

 4   face and the penalties that could result.  I also have to make

 5   sure that there's a factual basis for the plea, which means that

 6   there's reason for me to believe that you're really guilty and

 7   that you'll admit that you committed the crime.  I also need to

 8   review the rights that you would give up if you choose to plead

 9   guilty.  So I'm going to have to ask you some questions that

10   you'll have to answer under oath, so I'm going to ask you to

11   stand up, raise your right hand, and the clerk is going to swear

12   you to tell the truth.

13               STEVEN SORENSEN, DEFENDANT, SWORN

14           THE COURT:  All right.  You can have a seat.

15       And I need to make sure that you understand now that you

16   have sworn to tell the truth, if you knowingly give any false

17   answers to my questions, you could be prosecuted for perjury.

18   Do you understand that?

19               THE DEFENDANT:  Yes, sir.

20               THE COURT:  My first questions are to make sure that

21   you're capable of proceeding today.

22       Tell me how old you are and how much formal education

23   you've had.

24               THE DEFENDANT:  I am 43, and I'm a high school

25   graduate.
```

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 7 of 49
Case: 22-1801   Document: 15      Filed: 11/03/2022   Pages: 112

7

```
 1              THE COURT:  You signed a plea agreement that was
 2      several pages long.  Were you able to read it and understand it
 3      before you signed it?
 4              THE DEFENDANT:  Yes, Your Honor.
 5              THE COURT:  Let's find out if there's anything that
 6      would interfere with your understanding or your decision-making
 7      today.
 8          Do you suffer from any physical or mental conditions?
 9              THE DEFENDANT:  No, sir.
10              THE COURT:  Do you take any medication?
11              THE DEFENDANT:  Yes.
12              THE COURT:  Tell me what you take.
13              THE DEFENDANT:  Sertraline and buspirone.
14              THE COURT:  What are those for?
15              THE DEFENDANT:  For anxiety.
16              THE COURT:  All right.  So that sounds like a mental
17      condition to me.  I'm talking about your anxiety.
18              THE DEFENDANT:  Well, I pace a lot, and I kind of have
19      a racing mind and short attention span.
20              THE COURT:  All right.
21              THE DEFENDANT:  I don't know.
22              THE COURT:  Would that condition interfere with your
23      ability to understand what we're doing today?
24              THE DEFENDANT:  No, sir.
25              THE COURT:  Okay.  Would it interfere with your ability
```

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 8 of 49
Case: 22-1801   Document: 15   Filed: 11/03/2022   Pages: 112

8

```
1    to make a good decision about an important matter like pleading
2    guilty to a crime.
3              THE DEFENDANT:  No.
4              THE COURT:  And how about the medication?  Does that
5    interfere with your understanding or your decision-making at
6    all?
7              THE DEFENDANT:  No, sir.
8              THE COURT:  Are you addicted to drugs or alcohol?
9              THE DEFENDANT:  Yes.
10             THE COURT:  Tell me about that.
11             THE DEFENDANT:  I have a pretty serious meth addiction,
12   I think.
13             THE COURT:  All right.  How long -- are you under the
14   influence of any drugs or alcohol right now other than the
15   medications that we discussed?
16             THE DEFENDANT:  No, sir.
17             THE COURT:  How long have you been sober?
18             THE DEFENDANT:  14 months.
19             THE COURT:  Okay.  During the time of your
20   incarceration; is that right?
21             THE DEFENDANT:  Yes, sir.
22             THE COURT:  Okay.  Do you feel like your substance
23   dependencies have any current effect on your understanding or
24   your decision-making?
25             THE DEFENDANT:  No, sir.
```

App.9

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 9 of 49
Case: 22-1801   Document: 15   Filed: 11/03/2022   Pages: 112

9

1          THE COURT:  Okay.  Is there any other reason that you

2   would have a hard time understanding what we're doing today or a

3   hard time making a decision about an important matter like

4   pleading guilty?

5          THE DEFENDANT:  No.

6          THE COURT:  Mr. Sorensen, have you talked with Mr.

7   Vlisides about the nature of the charges that you face?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Have you talked about the facts the

10  government thinks it could prove if the case went to trial?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Have you talked about whether you have any

13  defenses to the charges?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Okay.  Have you talked about the sentencing

16  guidelines and how the guidelines might affect the sentence

17  you'll receive?

18         THE DEFENDANT:  Yes, sir.

19         THE COURT:  Tell me what you think you're being charged

20  with.

21         THE DEFENDANT:  A felon in possession of a firearm.

22         THE COURT:  All right.  Do you understand if I accept

23  your plea and find you guilty, you could be subject to the

24  penalties that Mr. Stephan went over?  Do you understand that?

25         THE DEFENDANT:  Yes, sir.

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 10 of 49
Case: 22-1801    Document: 15      Filed: 11/03/2022    Pages: 112

10

```
 1              THE COURT:  That means I could sentence you to up to
 2     ten years in prison.  Do you understand that?
 3              THE DEFENDANT:  Yes, sir.
 4              THE COURT:  I could impose a fine of up to $250,000.
 5     Do you understand that?
 6              THE DEFENDANT:  Yes, sir.
 7              THE COURT:  I will have to impose the mandatory $100
 8     criminal assessment penalty.  Do you understand that?
 9              THE DEFENDANT:  Yes.
10              THE COURT:  Any period of incarceration could be
11     followed by a period of supervised release of up to three years.
12     Do you understand that?
13              THE DEFENDANT:  Yes, sir.
14              THE COURT:  Do you know how supervised release works?
15              THE DEFENDANT:  Well, I would imagine it's something
16     like probation.
17              THE COURT:  It's very much like that.  So I would
18     impose conditions and restrictions on you.  You would have to
19     report in to a supervising officer, and if you were to violate
20     any of the conditions or restrictions, I could revoke your
21     supervised release and send you back to prison because you
22     violated the conditions.  Do you understand all that?
23              THE DEFENDANT:  Yes, sir.
24              THE COURT:  Let's talk about the federal sentencing
25     guidelines.  Because this is a combined plea and sentencing
```

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 11 of 49
Case: 22-1801      Document: 15      Filed: 11/03/2022      Pages: 112

11

1    hearing, we have already gone through much of the process.

2    We've prepared the presentence report, which we'll talk about in

3    a minute, but there's a few points about the guidelines that I

4    want to discuss with you.

5         First of all, you understand in considering the guidelines

6    we are not limited solely to the charge as it's articulated in

7    the indictment, but we can look more broadly at how you

8    committed your crime?  Do you understand that?

9              THE DEFENDANT:  Yes, sir.

10             THE COURT:  All right.  The fact that you've accepted

11   responsibility by agreeing to plead guilty, that's a factor that

12   counts in your favor under the guidelines.  Do you understand

13   that?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  Okay.  Your criminal history gets

16   considered under the guidelines.  Do you understand that?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Do you understand that the general

19   perspective of the guidelines is to consider a broad range of

20   factors about you and your background and particularly about

21   your crime and how it was committed?  Do you understand that?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  All right.  So, again, the process should

24   be familiar to you because we've already gone through a lot of

25   it, but there's a couple of points that I want to make.

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 12 of 49
Case: 22-1801   Document: 15   Filed: 11/03/2022   Pages: 112

12

```
1          First of all, it's important that you review the
2     presentence report in draft form and review it with your
3     attorney.  Have you done that?
4                    THE DEFENDANT:  Yes, sir.
5                    THE COURT:  Okay.  And the reason that's important is
6     that you have the right to make objections.  Do you understand
7     you've got the right to make objections, and if there's anything
8     that was incorrect or incomplete in that report, you could raise
9     those issues with me?  Do you understand that?
10                   THE DEFENDANT:  Yes, sir.
11                   THE COURT:  Okay.  All right.  Here's the most
12    important point to take away from our discussion of the
13    guidelines:  The guidelines are advisory.  I'll consider them,
14    but I don't have to follow them strictly.  I can go above the
15    guidelines or below the guidelines if I think that's appropriate
16    after I consider everything that the law tells me to consider.
17    Do you understand that the guidelines are advisory?
18                   THE DEFENDANT:  Yes, sir.
19                   THE COURT:  By pleading guilty today, you would give up
20    some constitutional rights that you have as a person who has
21    been accused of a crime.  I want to review some of those rights
22    with you.
23         First, do you understand that you have the right to go to a
24    trial and have a jury decide if you're guilty?
25                   THE DEFENDANT:  Yes, sir.
```

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 13 of 49
Case: 22-1801   Document: 15   Filed: 11/03/2022   Pages: 112

13

1            THE COURT:  And you know you could be convicted only if

2     all 12 members of the jury agreed that the government has proved

3     beyond a reasonable doubt that you are guilty.  Do you

4     understand that?

5            THE DEFENDANT:  Yes, sir.

6            THE COURT:  You and your lawyers would be able to help

7     select the people who would serve on the jury.  Do you

8     understand that?

9            THE DEFENDANT:  Yes, sir.

10           THE COURT:  Under the Constitution of the United

11    States, no one can be forced to admit that they have committed a

12    crime, and that means that you do not have to plead guilty.  You

13    can stick with a plea of not guilty.  Do you understand that?

14           THE DEFENDANT:  Yes, sir.

15           THE COURT:  If the case went to trial, you would not

16    have to testify or say anything at all, and I would tell the

17    jury that they couldn't hold that against you in any way.  Do

18    you understand that?

19           THE DEFENDANT:  Yes, sir.

20           THE COURT:  Although you wouldn't have to testify,

21    you'd have the right to testify if you wanted to.  Do you

22    understand you'd have that right?

23           THE DEFENDANT:  Yes, sir.

24           THE COURT:  You'd also have the right to do what we

25    call confront and cross-examine the government's witnesses.

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 14 of 49
Case: 22-1801   Document: 15   Filed: 11/03/2022   Pages: 112

14

1    That means you could confront them by facing them in the

2    courtroom while they testified.  You could cross-examine them by

3    having your lawyers ask them questions.  Do you understand that?

4              THE DEFENDANT:  Yes, sir.

5              THE COURT:  You also have the right to call your own

6    witnesses, and even if those witnesses didn't want to testify,

7    you could compel them to testify by using a subpoena.  Do you

8    understand that?

9              THE DEFENDANT:  Yes, sir.

10             THE COURT:  A felony offense affects your civil rights

11   outside the scope of this proceeding.  Some of this is familiar

12   to you, given the nature of the charge that you face today, but

13   I want to review this with you again.

14         Depending on the law where you live, after you've been

15   convicted of a felony, you may not have the right to vote, the

16   right to hold public office, or the right to serve on a jury.

17   Do you understand that?

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  And once you've been convicted of a felony,

20   you are permanently deprived of the right to possess any kind of

21   firearm or ammunition for a firearm, and if you did possess a

22   firearm or ammunition, you could be charged with a new crime.

23   Do you understand that?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  If you were not a United States citizen, a

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 15 of 49
Case: 22-1801   Document: 15   Filed: 11/03/2022   Pages: 112

15

1    felony conviction could affect your residency or immigration

2    status and could result in immigration-related penalties,

3    including deportation from the United States.  Do you understand

4    that?

5            THE DEFENDANT:  Yes, sir.

6            THE COURT:  Last point about your rights is that you

7    have the right to an attorney through all phases of this

8    proceeding.  That includes an attorney appointed at government

9    expense if you can't afford one.  Do you understand you have the

10   right to counsel?

11           THE DEFENDANT:  Yes, sir.

12           THE COURT:  All right.  Our next task is to look at the

13   plea agreement to make sure that it's voluntary.  So the plea

14   agreement has been filed with the Court as Document No. 27.

15   It's several pages long, and at the end of it, it looks like

16   there is your name and a space for your signature in a couple of

17   places, and it looks to me like you signed the plea agreement.

18       Did you sign that plea agreement, Mr. Sorensen?

19           THE DEFENDANT:  Yes, sir.

20           THE COURT:  And did you review it carefully before you

21   signed it?

22           THE DEFENDANT:  Yes.

23           THE COURT:  All right.  And does that document contain

24   your agreement with the government about your plea?

25           THE DEFENDANT:  Yes, sir.

Case: 3:21-cr-00056-jdp    Document #: 53    Filed: 05/10/22    Page 16 of 49
Case: 22-1801    Document: 15    Filed: 11/03/2022    Pages: 112

16

```
1              THE COURT:  All right.  Mr. Vlisides, does that
2      document contain your agreement with the government about Mr.
3      Sorensen's plea?
4              MR. VLISIDES:  Yes, Your Honor.
5              THE COURT:  And, Mr. Wegner (sic), does that contain
6      the government's agreement with Mr. Sorensen about his plea?
7              MR. STEPHAN:  It does, Your Honor.
8              THE COURT:  All right.  All right.  There's one point
9      that I want to make sure you understand, Mr. Sorensen.  This is
10     a conditional guilty plea, which means that ordinarily when you
11     plead guilty, you give up your right to appeal certain aspects
12     of the conviction, but here you're reserving your right to
13     appeal your motion that you should be allowed to present the
14     defense that you had innocently possessed the firearm.  Under
15     the plea agreement, you still have the right to appeal that
16     decision denying your motion to present that defense even though
17     you're pleading guilty.  Do you understand that?
18             THE DEFENDANT:  Yes, sir.
19             THE COURT:  All right.  Mr. Sorensen, did anyone make
20     any other promises to get you to plead guilty besides what's in
21     the plea agreement?
22             THE DEFENDANT:  No, Your Honor.
23             THE COURT:  Did anyone threaten you or try to force you
24     to plead guilty?
25             THE DEFENDANT:  No, Your Honor.
```

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 17 of 49
Case: 22-1801    Document: 15      Filed: 11/03/2022    Pages: 112

17

1          THE COURT:  Anyone tell you that you'll get some

2    particular sentence in this case?

3          THE DEFENDANT:  No, sir.

4          THE COURT:  And you understand that the sentencing

5    decision will be up to me?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  And I will consider the arguments of

8    counsel, I'll consider the guidelines, I'll consider any

9    recommendations that the government makes, but I don't have to

10   follow any of those things, and if I choose not to follow any of

11   those things, that does not give you any basis to withdraw your

12   guilty plea.  Do you understand that?

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  Our next task is to determine whether

15   there's a factual basis for the plea.  The factual basis is

16   spelled out in writing in paragraph 6 of the plea agreement, and

17   I'm going to begin by asking the government if the government is

18   going to rely on the written statement of the factual basis or

19   if there's anything else the government wants to rely on in

20   terms of the factual basis.

21         MR. STEPHAN:  Yes, we would rely upon the factual basis

22   in the plea letter and no additional supplements.

23         THE COURT:  All right.  Very good.

24      Then, Mr. Sorensen, you already told me generally that you

25   reviewed the plea agreement carefully, but I'm going to ask you

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 18 of 49
Case: 22-1801    Document: 15     Filed: 11/03/2022    Pages: 112

18

1    specifically about paragraph 6.

2         Did you review paragraph 6 carefully before you signed the

3    plea agreement?

4              THE DEFENDANT:  Yes, sir.

5              THE COURT:  Do you agree that the government can prove

6    those facts?

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  And, Mr. Vlisides, do you agree?  Can the

9    government prove the facts in paragraph 6 of the plea agreement?

10             MR. VLISIDES:  Yes, Your Honor.

11             THE COURT:  All right.  So just a couple of points that

12   relate to your knowledge, Mr. Sorensen, that I want to go over.

13        So on February -- I'm sorry.  On March 5th and March 6th,

14   2021, did you know at that time that you had been convicted of a

15   felony, Mr. Sorensen?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  So you knew that you had been convicted of

18   a crime that carried a potential penalty of more than a year; is

19   that right?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  Okay.  And then on that date, did you

22   possess the firearm that had been in that -- in the Subaru car?

23             THE DEFENDANT:  Yeah, I did, but not intentionally.

24             THE COURT:  Okay.  When you say "not intentionally,"

25   tell me what you mean by that.

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 19 of 49
Case: 22-1801      Document: 15      Filed: 11/03/2022      Pages: 112

19

```
 1          THE DEFENDANT:  Okay, sir.  Well, I borrowed a car with
 2   permission, as far as I understood it, and after being in the
 3   car for a while, I noticed that there was a gun in the car.  So
 4   I immediately took it to the nearest place I could to dispose of
 5   it.  I didn't know what to do with it.  I thought I was -- I
 6   knew that the crime of felon in possession of a firearm was a
 7   ten-year minimum sentence is what I thought at the time, so
 8   there's no way I was going to hang onto that thing for any
 9   longer than I had to.  I didn't want to leave it in the car.  I
10   didn't want to take it and put it in my car because I was
11   afraid -- because my car had been broken down.  That's how I
12   ended up with this car.  So I didn't want to put it in my car,
13   so across the street there was a community center that I thought
14   I had seen a drop box in there for like --
15          THE COURT:  And we can get to the details here.
16          THE DEFENDANT:  All right.  All right.
17          THE COURT:  Here's the thing that I'm trying to
18   confirm:  So you say that you didn't intentionally possess the
19   firearm, but --
20          THE DEFENDANT:  Yes.
21          THE COURT:  -- what I'm trying -- I understand that
22   your explanation is that you wanted to get rid of it as soon as
23   you could.
24          THE DEFENDANT:  Uh-huh.
25          THE COURT:  But there was -- it was no accident that
```

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 20 of 49
Case: 22-1801   Document: 15   Filed: 11/03/2022   Pages: 112

20

1    you took the firearm from the car and put it in the Goodwill

2    store; is that correct?

3            THE DEFENDANT:  Yes, sir.

4            THE COURT:  That was an intentional act by you.  You

5    took control of the gun, took it out of the car, and took it and

6    put it in a Goodwill store.

7            THE DEFENDANT:  I did it to prevent the passenger that

8    was with me --

9            THE COURT:  I don't care why you did it.

10           THE DEFENDANT:  Okay.

11           THE COURT:  The question is --

12           THE DEFENDANT:  Yes, sir.

13           THE COURT:  -- did you take control of the gun and take

14   it from the car and put it in the Goodwill store?

15           THE DEFENDANT:  Yes, sir.

16           THE COURT:  Okay.  Mr. Wegner (sic), is there any other

17   fact or information that you think I should review with Mr.

18   Sorensen before I ask for his plea?

19           MR. STEPHAN:  No.  Thank you, Your Honor.

20           THE COURT:  All right.  Mr. Sorensen, what is your plea

21   to Count 1 of the indictment?

22           THE DEFENDANT:  Guilty.

23           THE COURT:  On the basis of this discussion with you

24   and your attorney and on the basis of the record in the case as

25   a whole, I'm satisfied that you have entered a plea of guilty

1    knowingly and voluntarily and that you did so after having an

2    adequate opportunity to consult with your attorney with an

3    understanding of -- that you have an understanding of the nature

4    of the charge and the consequences of a plea of guilty.  I'm

5    also satisfied that there is a factual basis for the plea.

6    Accordingly, I find you guilty of the charge contained in Count

7    1 of the indictment, and I accept the plea agreement.  I've

8    already reviewed the presentence report, so I can tell you I'm

9    accepting the plea agreement, and we're ready to proceed with

10   the sentencing portion of our hearing.

11         All right.  Jessica Koch is with us.  She is the probation

12   officer who prepared the presentence report.

13         Here are the materials I've reviewed:  I've got the

14   presentence report, a statement from the government that there

15   were no objections.  I've got the objection and a clarification

16   from the defendant.  I've got the addendum to the presentence

17   report and the revised presentencing report.  I've got a

18   sentencing memorandum from both sides, and then I have some

19   letters in support and some materials in support of Mr. Sorensen

20   as well.

21         Did I miss anything, Mr. Wegner (sic)?

22              MR. STEPHAN:  No.  Thank you, Your Honor.

23              THE COURT:  Mr. Vlisides?

24              MR. VLISIDES:  No documents, Your Honor.  I will -- I

25   do want to address the presentence report objections.

1          THE COURT:  Okay.  I think your objection was embraced

2     by the probation office; is that correct?

3          MR. VLISIDES:  To the extent -- to an extent.  The

4     probation office indicated that it couldn't consider the

5     affidavit that we had referenced in the objections because our

6     motion to supplement hadn't been granted, so I would just ask,

7     now that that has been granted, that those changes be reflected

8     in I believe it's paragraph 11 of the presentence report that we

9     sought to supplement.

10         THE COURT:  Okay.  And how do you propose to supplement

11    paragraph 11?  Do you want to incorporate the entire affidavit?

12         MR. VLISIDES:  Just by reference I think is sufficient.

13         THE COURT:  All right.  I will ask that paragraph 11 be

14    reflected to amend that the defendant has submitted his version

15    of the facts in an affidavit, and so we can reflect that.

16    Okay.  And then there was a guideline issue that the

17    probation office has endorsed in your favor, and so I believe

18    that was the enhancement for use of the firearm in connection

19    with another crime, and so that has been removed.  So no further

20    objections to the guideline calculations, I believe; is that

21    right?

22         MR. VLISIDES:  Correct, Your Honor.

23         THE COURT:  And with the amendment that I have called

24    for in paragraph 11, are the adjustments that you called for,

25    have they been adequately reflected in the report as it will be

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 23 of 49
Case: 22-1801     Document: 15     Filed: 11/03/2022     Pages: 112

23

```
 1    revised?

 2              MR. VLISIDES:  Yes, Your Honor.  Thank you.

 3              THE COURT:  Okay.  All right.

 4        Then, Mr. Sorensen, you told me that you have reviewed the

 5    presentence report with your lawyers, and so I want to again ask

 6    you to confirm that.  You've reviewed the presentence report

 7    carefully?

 8              THE DEFENDANT:  Yes, sir.

 9              THE COURT:  Do you have any other changes or

10    corrections or objections to the report?

11              THE DEFENDANT:  No, sir.

12              THE COURT:  All right.  Then I'll adopt the facts in

13    the presentence report as the facts on which I will base my

14    sentence.  We'll discuss specifically the versions of the

15    offense conduct, I'm sure, and I will let you know my assessment

16    of those after we finish discussing them.  But other than that,

17    I'll accept the plea agreement.  I will base my sentence on the

18    facts in the report as we will discuss further, and the plea

19    agreement does not undermine the statutory purposes of

20    sentencing.  I will take into consideration the advisory

21    guidelines and the statutory purposes of sentencing that are set

22    out in Title 18 of the United States Code at Section 3553(a).

23        We have covered the objections, and then in light of the

24    revised presentence report, I think we're in agreement on where

25    the guidelines take us.  Let me confirm that the government
```

1   supports the third level of reduction for acceptance of

2   responsibility; is that correct?

3         MR. STEPHAN:  Yes, Your Honor.

4         THE COURT:  So with a total offense level then of 19,

5   criminal history is in category VI, the guideline imprisonment

6   range is 63 to 78 months.

7      Do you agree with that, Mr. Wegner?

8         MR. STEPHAN:  Yes, Your Honor.

9         THE COURT:  And, Mr. Vlisides?

10        MR. VLISIDES:  Yes, Your Honor.

11        THE COURT:  Okay.  All right.  That's where the

12  sentencing guidelines take us.  I have your sentencing memos,

13  but let's find out what else the parties want me to consider.

14     Mr. Wegner?

15        MR. STEPHAN:  Your Honor, the defendant here even today

16  continues to try and minimize his behavior by saying that he was

17  trying to do this good thing by getting rid of the gun.  He

18  stole a car and by stealing the car later found out that he also

19  stole the gun, and as opposed to doing something as simple as

20  returning the car to where he had taken it from and leaving it

21  locked and walking away from it, there's this whole series of

22  bad decisions that follow.  And I don't believe for a minute

23  that the defendant was -- really started off with the idea that

24  he was looking for a safe way to dispose of the gun.  I think

25  the defendant knew that he was driving a stolen car.  He

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 25 of 49
Case: 22-1801     Document: 15       Filed: 11/03/2022   Pages: 112

25

1    obviously knew when his girlfriend was getting arrested that the

2    police were looking for him and that he was probably going to

3    get arrested.  I mean, this is just simply a matter of him

4    trying to dispose of the gun so he didn't get caught with it.

5    You know, he had several better decisions to make than what he

6    made right now, and the decision that he made here suggests only

7    that he was looking out for himself and not anyone else.

8         Thank you.

9         THE COURT:  All right.  Thank you.

10    Mr. Vlisides?

11         MR. VLISIDES:  Thank you, Your Honor.

12         THE COURT:  Good place to start because this story that

13    he was trying to dispose of this gun safely would ring a lot

14    truer if it weren't prompted by the presence of the police,

15    which I think makes it really hard to swallow.

16         MR. VLISIDES:  Your Honor, I think there -- the

17    starting point, the big picture, is that he didn't want guns,

18    had no history with guns, verifiably had this gun for --

19         THE COURT:  He had a history with fake guns.  He has

20    prior convictions --

21         MR. VLISIDES:  With BB guns.

22         THE COURT:  -- where he used BB guns.

23         MR. VLISIDES:  Absolutely, Your Honor.  I mean, that

24    addresses the point that he had no interest in carrying real

25    guns, which is the offense that we're here to address.  And I

App.26

1    think, you know, there's a really big difference in the danger

2    posed by a BB gun than a real gun, and that's why we have

3    federal statutes and come to federal court to punish a felon in

4    possession of a firearm and not a felon in possession of a BB

5    gun.

6        You know, again, I just -- I do think the big picture is

7    that this is not a person who wanted to carry a gun, who needs

8    to be deterred from carrying guns, and that's -- those are the

9    big aspects of sentencing often when we come into a courtroom.

10   That's the goal of sentencing -- or, you know, not the exclusive

11   goals, but the big picture goals are often how can we make sure

12   that this person isn't carrying guns.  And this case is just

13   really different because that consideration is not at the core

14   here.  He just doesn't carry guns.

15       Obviously, the -- you know, it was not handled ideally,

16   right?  I mean, we are here to punish the offense of

17   intentionally taking the gun.  There are state proceedings that

18   are going to punish or are seeking to punish his behavior.  We

19   have a pending revocation based on this conduct.  We have new

20   charges related to this conduct, you know, including, you know,

21   the pending case for operating without consent of a vehicle.  So

22   there is going to be punishment here, and the question is what

23   is this court punishing and what is the sentence accomplishing

24   on top of the things that the state is handling?  And the

25   typical things that we're seeking to accomplish with a sentence

1    for a felon in possession are to deter the person from carrying

2    guns, to protect the person -- the public from a person -- a

3    felon who is seeking to carry guns.  It's just not the case

4    here.  And so that, I think, really puts it in a different

5    category, separates it from nearly all felon in possession

6    cases, and distinguishes it from the guidelines where that,

7    again, is the primary purpose.

8        And then, you know, looking to his history, very severe

9    meth addict, commits crimes like shoplifting, carrying knives,

10    you know, those types of offenses when he is under the throes of

11    addiction.  When he's not, you know, we had that really good

12    period.  You know, 2016 to 2018 he's in drug court.  He's doing

13    well.  He's sober.  You know, has not always done well on

14    supervision.  Obviously, he's been on supervision for most of,

15    you know, the course of his addiction for the last eight or so

16    years, but when he's sober, he does well, you know.  Had a

17    business, good work ethic, you know, has family support in the

18    courtroom today.  His sister Krissy, who submitted a letter, and

19    his nieces are here.

20        So there are things that we look at and say supervision can

21    address, particularly intense federal supervision, you know, and

22    so -- and then on the other side of the ledger, the goals of

23    sentencing, the goals of incarceration weigh significantly

24    different in this case than in others.  I just -- the goals just

25    aren't there in the way that they are when we're trying to deter

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 28 of 49
Case: 22-1801   Document: 15   Filed: 11/03/2022   Pages: 112

28

1      people from carrying guns.  And so, you know, I want to address

2      the questions we need to get into, the factual things, and I

3      know Mr. Sorensen wants to address the Court as well, but, you

4      know, that's the big picture here to me.

5             THE COURT:  I would agree with you that this is an

6      unusual case.  The circumstances in which he came to possess the

7      gun are unusual, but my view of the case is that Mr. Sorensen is

8      an out-of-control meth addict.  He's an out-of-control meth

9      addict most of the time.  The state has exhausted itself in

10     providing him with the resources to address his addictions, and

11     he hasn't taken advantage.  It works for a while, but he returns

12     to using meth.  And then he has compiled a massive criminal

13     history, of lower-level crimes there's no doubt, but what he

14     makes up -- what he lacks in quality he makes up in quantity.

15     And I just can't be optimistic about his chances of success

16     because his record says that he will succeed for a while, then

17     he will relapse, and then he is -- he's a menace to the

18     community.

19            MR. VLISIDES:  So I think that dives in on what we're

20     addressing here and what we're punishing here, which is his

21     addiction, and I think then --

22            THE COURT:  What we're really dealing with is what he

23     does when he's an addict, because I don't sentence people to

24     prison because they're an addict.  I deal with what they do as a

25     result, and then I make an assessment of whether they're able to

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 29 of 49
Case: 22-1801   Document: 15   Filed: 11/03/2022   Pages: 112

29

1    manage their illness in a way that is safe for the community,

2    and Mr. Sorensen has not been able to do that.

3           MR. VLISIDES:  Agreed, Your Honor, of course.  But, for

4    one, we're talking about someone who has been in custody for 14

5    months.  Unless the Court grants him credit, he will not receive

6    that credit against his federal sentence.  And so already we're

7    looking at 14 months plus additional time, and so this is not a

8    slap on the wrist, not to mention, of course, the pending state

9    cases where he will receive punishment for much of what we're

10   talking about here.  And then the -- so we look at, okay, well,

11   what is the sentence that's appropriate, and the -- you know,

12   we're calibrating for the level of danger, right?  And when --

13   if someone is a, you know, a meth addict who is carrying guns,

14   that is one category of danger, and that just isn't the case

15   here, right?

16          So when we look at whether, you know, 12-month, 24-month,

17   30-month, whatever the sentence would be, you know, what is the

18   danger that he poses and how can we address it?  Well, the

19   danger, you know, he's not -- you know, I don't want to say we

20   know the future, but, like, there's just no indication that he's

21   going to go out and carry guns, so that danger, I don't believe,

22   is addressed by the sentence.  And so if the danger is that he

23   relapses, he's going to be on federal supervision.  We're asking

24   that he come out to a halfway house directly so that he can

25   re-establish his career before having any kind of, you know,

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 30 of 49
Case: 22-1801   Document: 15   Filed: 11/03/2022   Pages: 112

30

1    meaningful independence.  And then once he's out, he's going to

2    be on, you know, as strict of drug testing as this court can

3    provide, and if he relapses, this court will know, and he will

4    be right back here.  And so the -- it's an important factor

5    that, you know, if he relapses, he doesn't pose the danger that

6    other people who go out and commit violent offenses or carry

7    guns pose, right?  If he relapses, he may go shoplift, and then

8    he'll be back in this court for failing drug tests and getting

9    arrested.

10        And so, you know, that's -- we're always calibrating for

11   that, and so the protection of the public aspect here, if he

12   were to relapse, I don't think rises nearly to the level of

13   other cases or comparable, quote, unquote, cases.  And so that's

14   a really important factor, that he's going to have that strong

15   supervision, and the, you know, the ripples out from a possible

16   relapse, which is always a possibility with an addict, those

17   ripples out are significantly less dangerous and significantly

18   less severe than in a case where people are intentionally

19   carrying guns.

20            THE COURT:  All right.  Mr. Sorensen, you've got the

21   right to address me before I decide what to do on your sentence.

22   I'd be eager to hear from you.

23            MR. BUGNI:  Sorry.  Could we just have 30 seconds with

24   Mr. Sorensen?

25            THE COURT:  Yes.

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 31 of 49
Case: 22-1801   Document: 15   Filed: 11/03/2022   Pages: 112

31

1          (Discussion held off the record between Mr. Bugni, Mr.

2     Vlisides, and the Defendant.)

3          MR. BUGNI:  Judge, so he can hear it from your mouth,

4     when you said you didn't care why he had the gun, you were

5     talking about for the plea.  Now you'd really like to hear

6     everything.

7          THE COURT:  I will share that with you, Mr. Sorensen.

8     For purposes of the plea, I just need to establish that you did

9     intentionally take control of the gun.

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  That's what possession means is that's

12     within your control.  Now you can offer whatever explanation for

13     your conduct that you want me to try to understand.

14          THE DEFENDANT:  Okay.  Yes, Your Honor.  I made a lot

15     of bad decisions.  There's no doubt about that.  And I've had

16     some incidences over the last few years that really affected my

17     decision-making and as far as relapsing and going back to meth

18     after having a couple years of sobriety through drug court, and

19     then prior to that I was doing well until I got divorced.  But,

20     regardless, I don't plan on going back to meth.  I have the

21     tools it takes to stay sober.  I know the recovery community in

22     Eau Claire, and I want to be part of that community.  I want to

23     help other people in the recovery community, be a part of my

24     church, and be an important part to my family.  And, like, I was

25     always kind of one that my family mostly looked up to up until

1    my middle, late 30s when I started to just give up on life

2    basically because my cookie-cutter fantasy of what life should

3    be wasn't working out the way I thought it should be, so I

4    became self-destructive, turned to meth.  Led me up to this

5    point where on that day I had come to a friend's house.  My

6    vehicle had broken down.  I walked to a mechanic friend of mine,

7    and there was no one home, and I ran into another person that

8    was going to the same person's house, and they mentioned, "Go

9    ahead and use this car.  Follow us to our house."  So that's how

10   I ended up with the car.

11        Now, being in a clear state of mind, I would have normally

12   second guessed that idea, but after I had just walked 12 miles,

13   it was 4:30 in the morning, and I was, like, dehydrated,

14   overexhausted, I'm getting in that car.  And the next day I

15   realized there was a pistol there, right near the Goodwill --

16        THE COURT:  But you didn't take the car -- even -- I

17   find the story sort of hard to accept.  There's no corroboration

18   for it.  Nobody else has endorsed this version of the events,

19   but even under your version, somebody said, "Follow me to this

20   house," and then you just left with the car and kept it for

21   days.

22        THE DEFENDANT:  Well, they were gone before I could

23   back out and turn around.  They had parked in front of the

24   building.  This car was behind, and it was a guy and his

25   girlfriend, so I figured that that must have been her car and

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 33 of 49
Case: 22-1801   Document: 15   Filed: 11/03/2022   Pages: 112

33

1    his car was in front and he didn't want me to ride with her

2    or -- I don't know.  I wasn't in my right state of mind.  I'm

3    not going to argue that.  I had been up for a couple days, and,

4    like I say, I had just walked all that way from my vehicle over

5    to the other side of town.

6        But, regardless, I don't mess with guns.  I don't associate

7    with people who tote guns.  I'm not like a gangster type of guy.

8    I carry knives a lot because I'm in the flooring business, and

9    so I've always had a knife all the time.  And the knives that I

10   would have would just be like a pocketknife or folding knife.  I

11   know in this incident there was a large knife involved or

12   something, I think, in one of the bags or something, but that

13   was something that was in the car already too.  So I don't know

14   exactly what that was.  But I just wanted to make sure you

15   understand that I'm not like a gangbanger-type person or -- I

16   hang out with guys that are subcontractors and mechanics and

17   that have families.

18       And, I mean, I've been kind of a scumbag the last few years

19   doing foolish things like just retail theft-type stuff, being

20   self-destructive, basically trying to get myself put in jail so

21   that I could get sober.  But up until this point in my life, I'd

22   never spent more than three months in jail at a single time.

23   All my life combined I've spent less time in jail than I have

24   over this last 14 months.  So this 14 months has really showed

25   me, like, what, you know, crime gets you.  It doesn't pay, and I

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 34 of 49
Case: 22-1801   Document: 15   Filed: 11/03/2022   Pages: 112

34

1    have absolutely nothing to go, you know, get out with other than

2    my knowledge of the business that I've run all these years

3    but -- so I don't know if that makes any sense but --

4            THE COURT:  I am not putting you in the same category

5    as the young man that I sentenced earlier in this week who

6    committed armed robberies while he was in the throes of his

7    addiction.

8            THE DEFENDANT:  Okay.

9            THE COURT:  That's not you.

10           THE DEFENDANT:  No, sir.

11           THE COURT:  But I think I've already articulated to Mr.

12   Vlisides what I think the problem is here is that I don't think

13   you're yet prepared to commit armed robberies, but I think

14   you're on a trajectory that to me seems like you're getting

15   worse and less under control rather than getting better.

16           THE DEFENDANT:  Your Honor, if I could just say that

17   this punishment for the last 14 months has been more than I

18   could imagine.  Like, I am not the type of person to be around a

19   lot of people, especially the people that are in jails, and so

20   it's been a very serious lesson to me.  I don't take it lightly

21   at all, and I don't take lightly the work it's going to take to

22   restore my ties to the community.  But at one time I was a

23   respected member of the community in Eau Claire, and I think

24   that Judge Schumacher there -- that's my judge in Eau Claire --

25   he knows me on a personal level, and he knows that I take good

1     care of myself and my family when I'm doing what I'm supposed to

2     be doing.  And so I was involved in a bad relationship that got

3     me into relapse mode about four or five years ago, and I don't

4     plan on going back to that at all.  I have a sober girlfriend

5     now that doesn't associate with meth or meth users or -- and she

6     lives in a different area, so I have a plan, you know.

7                 THE COURT:  All right.

8                 MR. VLISIDES:  Your Honor, could I address just the

9     questions about the, I guess, veracity of the story?

10                THE COURT:  Uh-huh.

11                MR. VLISIDES:  Because the Court said that there wasn't

12    any corroboration.  I can't quite agree with that.

13                THE COURT:  Okay.  Point it out.

14                MR. VLISIDES:  I know that, you know, after -- so we'll

15    start with, you know, the start of the story.  Mr. Sorensen, you

16    know, stated that he had run into this friend, Jake Berg,

17    identified him by name.  Officers went out and interviewed him.

18    He corroborated much of the story, that they had run into each

19    other, exactly where they were, the time of day.  He ultimately

20    didn't say to police officers, "Yes, I told him to take a car

21    that wasn't mine," but --

22                THE COURT:  That's the part that I was referring to

23    that was not corroborated.

24                MR. VLISIDES:  It was not, although, you know, this is

25    a person who was obviously in jail and talking to police

1    officers, so it would be legally inadvisable for him to say

2    that.  So we have corroboration of, you know -- and that's a

3    story that, you know, Mr. Sorensen put out those details, right?

4    And then they were in turn corroborated, place, time, person,

5    which I think gives an indication.

6         Then, you know, he has open cases.  He has things, you

7    know, reasons to be scared, you know, of police and obviously

8    the larger picture of having a gun.  I mean, when he goes into

9    the store, you know, he's milling around the area that he

10   describes for several minutes looking in -- you know, it's not

11   typical behavior, I suppose, of someone who is trying to ditch a

12   gun.  I mean, if that's the goal, like, there are other ways

13   that would seem to be easier to do that.  You know, none of us

14   like the result, but it just isn't -- it just isn't typical

15   behavior of someone trying to ditch a gun.  And, you know, it

16   just -- so we have his presence nearby, goes to the store, in

17   the area, ducking into the rooms.  You know, there is a lot to

18   say that that sequence of events happened, and I think some of

19   the details are --

20        THE COURT:  There's points of the story that we know

21   happened, right?  We know he took the car.  We know he dropped

22   the gun at the Goodwill.  It's the material in between and the

23   explanation of the motives that really matter.  And so, yes,

24   there's corroboration of when the car was taken.  There's never

25   been any mystery of that.  The fact that Mr. Berg was there, I

1    don't think that's -- that's not a mystery either.  It's that

2    Mr. Berg led Mr. Sorensen to believe that he had permission to

3    use the car.  That's the critical point, and that's not

4    corroborated.  And you can criticize Mr. Berg for not being

5    honest.  I get that.  I don't see a huge motivation for him to

6    lie at the point that he was interviewed, but even if he did,

7    the point is that there's no -- there's no positive

8    corroboration of the story, of the critical elements that make

9    it -- corroboration for the benign elements of the story is what

10   I'm looking at.

11              MR. VLISIDES:  Well, I mean -- and, again, one of the

12   benign elements is corroborated by, I think, his actions in the

13   store, you know, that he is looking in these rooms -- I mean,

14   again, I don't know what -- why is he doing that, I suppose, if

15   his only goal is to -- well, first, why is he doing that if he's

16   just carrying a gun, right?  Or if he's in the habit of carrying

17   a gun -- well, I mean, we know that that's not true, but, like,

18   if he found this gun and was just intentionally carrying it, why

19   is he doing that?  It doesn't make sense.  And so, you know,

20   he's clearly trying to do something with the gun, and maybe --

21   maybe the Court has doubt about the absolute most benign version

22   of those events, but what is clear is he does not want -- he

23   does not want to have a gun.  He doesn't want to have a gun.

24   You know, he says he's looking in these rooms for a box, a way

25   to get rid of it safely, but, again, in the bigger picture, if

1    we're trying to deter people from having guns, we're trying to

2    protect people who are intentionally having guns, it just

3    doesn't -- this sentence won't accomplish that.  It's already

4    been accomplished.

5           THE COURT:  All right.  Anything else?

6           MR. VLISIDES:  No, Your Honor.

7           THE COURT:  All right.  I'm going to take a recess.

8    We'll come back in a few minutes and finish up.

9           THE CLERK:  This Honorable Court stands in recess.

10          (Recess at 9:51 a.m. until 10:05 a.m.)

11          THE COURT:  Thanks for your patience.

12          I think the defense argument really wants me to look at the

13   gun in isolation and just look at that as sort of a freestanding

14   and isolated incident, but I think it's more appropriate to

15   really view this offense in the broader context, because the

16   guides that I have to sentencing are that I'm to look not only

17   at the offense but also the offender.  And I see this in the

18   broader context of a very long period of sustained criminal

19   activity that is, I think, in large part driven by addiction,

20   but it is really, really insistent conduct, and I think the

21   state courts have given Mr. Sorensen every opportunity to get

22   sober and correct his behavior, and he has a couple of times in

23   his history succeeded for a period of time, but, ultimately, he

24   has failed to maintain his sobriety, certainly not

25   permanently -- he's had periods of a couple of years more

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 39 of 49
Case: 22-1801   Document: 15   Filed: 11/03/2022   Pages: 112

39

1    recently after he successfully completed drug court in the 2015

2    area, but then he relapsed.  And I understand that the relapse

3    is triggered by life stressors, but stressors are part of life,

4    so that's always going to be there.  And so the question is not

5    whether you have stress.  If your sobriety takes only when you

6    don't have any stress, you're not going to stay sober.  You have

7    to be sober enough to maintain your sobriety when you face the

8    stressors that life will provide.

9         I will also note that, although the defense proposes that

10   supervision is really the answer, in this last go-around from

11   2016 to the 2019 area, the comments from the state supervising

12   officers are that he had failed on supervision, that he was not

13   successful on supervision.  He's been closely supervised before,

14   and it hasn't been enough to maintain his sobriety.  What he did

15   in this case was very dangerous with that gun.  Ultimately he

16   told the police where it was, but to abandon the gun on a shelf

17   where a kid could get it, that is very, very dangerous in

18   itself.

19        I don't know what to make, honestly, of Mr. Vlisides'

20   argument that his possession of the realistic looking BB guns is

21   somehow a mitigating explanation.  I just don't see it that way.

22   What I see is with the possession of those BB guns, although

23   they don't constitute a firearm felony, I just can't see that as

24   representing any kind of mitigating explanation that somehow his

25   conduct is not dangerous and he's not likely to do something

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 40 of 49
Case: 22-1801      Document: 15        Filed: 11/03/2022      Pages: 112

40

1    dangerous.  I just can't accept that as a mitigating

2    explanation.  His being charged with the knives and having those

3    BB guns I think speaks to the fact that he's really out of

4    control as an addict and that his conduct really is dangerous.

5    His explanation that he's in the flooring business doesn't wash

6    because he's not really in the flooring business at these times

7    when he's having these knives, and so I don't see that as a

8    mitigating explanation at all.  And so what I see instead here

9    is an escalating pattern of criminal conduct that would have

10   continued but for this prosecution.

11        Let me address an argument that was made in writing that we

12   didn't discuss today, and it's come up a couple of times

13   recently, about the political influence on the guidelines.  Now,

14   I find this to be a pretty good argument, and I have considered

15   it in child pornography cases where I think the guidelines are

16   entirely driven by political considerations and are not at all

17   really fundamentally based in the theory of the Sentencing

18   Commission, which is to synthesize historical sentencing

19   practices so that we can sentence more consistently.  But I

20   don't find it as compelling with the gun guideline because I

21   think the Sentencing Commission is, in fact, a body that is

22   there -- it's a kind of an interface between the courts and

23   Congress, and just because there is political input into

24   sentencing policy I don't think makes that guideline that's

25   affected by some political decision-making illegitimate.  It

1    depends on the kind of influence and the purpose behind the

2    influence, and in the child pornography guidelines, I find that

3    they have been swamped by political considerations, and they are

4    not a thoughtful response to current conditions or situations

5    which suggest an appropriate adjustment in sentencing policy.

6    In the firearm guidelines, given the increase in gun crime over

7    the years, I think that that influence on the guidelines I don't

8    think is the kind of influence that I would reject as

9    illegitimate.  So I don't think the guidelines for firearm

10   offenses are so tainted by illegitimate political influence that

11   I would reject them.  So I don't find that a very persuasive

12   argument.  So I'm not going to reject the guidelines on policy

13   grounds.

14        As in any case, I will consider the guidelines, but I'm not

15   obligated to follow them.  I can't presume that they are the

16   correct sentence, and I think that they are a point of

17   comparison here, but I don't think this is a sentence that I

18   will really -- I'm not going to sentence within the guidelines

19   because I think that the circumstances in which this firearm was

20   possessed are unusual enough to warrant a variance from the

21   guidelines to reflect the unusual circumstances of this

22   possession.  But I still have the usual concerns here, and I

23   think the guidelines are designed to address them, although I

24   don't think I need to sentence within the guidelines to address

25   my concern for public safety.  That should be a pretty strong

1    aspect of my comments so far.  I think it should have emerged

2    from my comments so far, and that is that I think that Mr.

3    Sorensen, when he is in the throes of his addiction, which is,

4    unfortunately, most of the time, he does represent a threat to

5    public safety and security, and, as I said, I think what he did

6    with the firearm here really was dangerous.

7         I don't know ultimately really what his purposes were.  His

8    possession of the BB guns, as I indicate, suggest to me that

9    he's capable of using a facsimile weapon for intimidation

10   purposes if it became necessary.  It also seems to me that he

11   would do anything to get money to support his addiction, and so

12   if he had a firearm, it's something that he could sell to get

13   money to use drugs.  I think the sentence that I impose here

14   really has to send a message of deterrence.  I think that the

15   argument here is that the incarceration so far has been a

16   sufficient deterrent.  I'm not persuaded by that, and I think a

17   longer sentence is, you know, frankly, enforced sobriety that I

18   think is a component of providing for public safety and

19   hopefully Mr. Sorensen's own recovery from his addiction.  And I

20   also have to reflect the seriousness of the offense, and, in

21   particular, I will look at it in the context of the defendant's

22   very, very substantial criminal history.

23        So here's what I believe is the correct sentence:  I think

24   that this crime warrants a sentence of 48 months.  I will

25   reflect that he has served about 14 months incarceration so far,

1    and I know that it would not be counted toward the sentence

2    because he's facing other criminal charges and has the

3    revocation sentence, so if I don't make this adjustment, he

4    would not be credited with this.  So I think the sentence should

5    be 48 months, but I will credit the 14 months that he served so

6    far, which means that I will impose a sentence of 34 months that

7    would start today.  And so that means that he would serve a

8    total term of incarceration of about 48 months and then, of

9    course, subject to good time reductions and all that.  But the

10   basic sentence would be 48 months because I will consider the 14

11   months that he has served so far.  So the sentence will be 34

12   months starting today.

13        I will run it concurrent with whatever sentence he gets in

14   the pending revocation matter because that's the same conduct at

15   the root of that revocation that we're facing -- that we're

16   dealing with here today.  You could argue that he should get

17   some additional time on the revocation, but given that I'm

18   giving a reasonably substantial sentence, I don't think it's

19   necessary to add anything for the revocation sentence, so it

20   will be concurrent with the revocation sentence.  But I will

21   stand silent on how the sentence runs with respect to the

22   pending charges that he faces because that includes conduct that

23   I'm not really considering here.  And so I'm not really

24   considering the theft of the car and those other pending

25   charges.  So I'll just stand silent on that.  The sentencing

1     judge can -- in those cases can look at what I've done here.

2     I've imposed a somewhat significant sentence here.  The judges

3     that have dealt with him before have been reasonably

4     accommodating of Mr. Sorensen's needs, so I don't see anywhere

5     where anybody has been excessively harsh in imposing any

6     sentences so far.  So they can look at what I've done here and

7     decide whether additional sentences warrant it.

8          So just be clear, the sentence will run concurrent with

9     Chippewa County, Wisconsin, Cases No. 19-CF-744, 20-CF-77, and

10    21-CF-188.  So they're concurrent with those.  But the pending

11    matters in Washington County, Minnesota, that's 82-CR-194913;

12    the Anoka County, Minnesota, case, 02-CR-197730; Eau Claire

13    County Circuit Court Case Nos. 20-CF-863, 21-CF-240, 21-CF-278,

14    and 21-CF-241, those -- I will stand silent on those -- on how

15    those will -- the federal sentence will run with respect to

16    those.

17         And then I'll ask, Ms. Koch, we've got the Eau Claire

18    County Circuit Court Case Nos. 19-CF-624, 1294, 1622, 1679.

19    Those are also revocation cases?

20              OFFICER KOCH:  Yes, Your Honor.  He hasn't been

21    sentenced on those yet.

22              THE COURT:  He has not been sentenced on those.

23              OFFICER KOCH:  My understanding is his sentencing is

24    set for May 6th.

25              THE COURT:  Okay.  And revocations -- in those

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 45 of 49
Case: 22-1801   Document: 15   Filed: 11/03/2022   Pages: 112

45

1    revocations, that is -- the underlying conduct is our conduct

2    here.

3         OFFICER KOCH:  Yes, Your Honor.

4         THE COURT:  So for those pending revocation sentences,

5    I will also run this sentence concurrent with those -- whatever

6    sentences he gets in those Eau Claire revocation cases.  Okay.

7    But I'm standing silent on the unresolved matters out of

8    Washington County, Minnesota; Anoka County, Minnesota; and Eau

9    Claire County cases that are still pending.  Okay.

10        Then I will impose the three-year term of supervised

11   release.  It's the maximum term that I have here.  The

12   supervision I think is obviously important given the criminal

13   history and the history of substance abuse, so I think the

14   supervision would be appropriate to run that for three years.  I

15   didn't get any objections on the conditions, but let's find out

16   now if there are any concerns with conditions 1 through 16 and

17   whether the defendant would like them read.

18        MR. VLISIDES:  No objections, and they don't need to be

19   read.

20        THE COURT:  Okay.  I will impose Conditions No. 1

21   through 16.  I'm also required to impose the

22   statutorily-required conditions.  There are three for you:

23   Don't commit any new crimes, don't illegally possess any

24   controlled substances, and don't -- and cooperate in providing a

25   DNA specimen.

1        A couple more points about supervision:  The conditions can

2    be adjusted during your term of supervised release, and the

3    point of supervision is not to trip you up and send you back to

4    prison.  You're struggling with addiction.  Relapse happens.  As

5    long as you're honest with your supervising officer and you

6    don't hide and avoid drug tests, if you're honest, there's no

7    problem you will encounter that we probably can deal with

8    without revocation and sending you back to prison as long as

9    you're honest about it.  So I would encourage you to embrace

10   your supervision in that spirit.

11       All right.  The offense isn't drug related, but the

12   defendant has a long history of drug use, so drug testing is not

13   waived, and it's addressed in the special conditions.

14       It is adjudged that the defendant is to pay the mandatory

15   $100 criminal assessment penalty to the Clerk of Court for the

16   Western District of Wisconsin immediately following sentencing.

17   The defendant is encouraged to fulfill the agreement to pay that

18   obligation because if you leave it unpaid, it can interfere with

19   your ability to participate in programming.

20       I do find that the defendant does not have the means to pay

21   a fine without impairing his ability to support himself upon

22   release from custody, so I impose no fine.

23       The probation office is to notify local law enforcement

24   agencies and the state attorney general of the defendant's

25   release to the community.

1          I recommend that the defendant participate in substance

2     abuse programming and that he be afforded prerelease placement

3     in a residential re-entry center with work release privileges.

4          Mr. Vlisides, did I adequately address your arguments in

5     mitigation?

6               MR. VLISIDES:  Yes, Your Honor.

7               THE COURT:  All right.  Mr. Sorensen, you've got the

8     right to appeal your conviction if you think your plea was

9     somehow unlawful or involuntary.  You've got the right to appeal

10    the sentence I've imposed if you think that's contrary to law,

11    but if you want to appeal, you must file a notice of appeal

12    within 14 days of entry of judgment in this case or within 14

13    days of any notice of appeal filed by the government, and I

14    should have the judgment entered probably on Monday.  And, of

15    course, you've reserved your right to appeal the decision on the

16    innocent possession.  But, anyway, if you want to do that,

17    you've got these deadlines.

18         If you can't afford the filing fee for the appeal, you can

19    apply for leave to appeal *in forma pauperis*, which means without

20    paying the filing fee.  If you can't afford an attorney to

21    represent you in the appeal, you can apply for court-appointed

22    counsel to represent you at government expense.

23         I think I've covered everything, but let's make sure I

24    didn't leave anything that I need to address.  So, Mr. Wegner,

25    anything for the government?

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 48 of 49
Case: 22-1801   Document: 15   Filed: 11/03/2022   Pages: 112

48

```
1            MR. STEPHAN:  No.  Thank you, Your Honor.

2            THE COURT:  Mr. Vlisides?

3            MR. VLISIDES:  One moment, Your Honor.

4            THE COURT:  Sure.

5            MR. VLISIDES:  Thank you.

6        (Discussion held off the record between Mr. Bugni, Mr.

7    Vlisides, and the Defendant.)

8            THE COURT:  Anything else?

9            MR. VLISIDES:  No, Your Honor.  Thank you.

10           THE COURT:  All right.  Ms. Koch, did I miss anything?

11           OFFICER KOCH:  No, Your Honor.

12           THE COURT:  All right.  Thank you, all.

13           THE CLERK:  This Honorable Court stands in recess.

14        (Proceedings concluded at 10:22 a.m.)

15                            ***

16

17

18

19

20

21

22

23

24

25
```

Case: 3:21-cr-00056-jdp   Document #: 53   Filed: 05/10/22   Page 49 of 49
Case: 22-1801   Document: 15   Filed: 11/03/2022   Pages: 112

49

```
 1          I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

 2     Reporter in and for the State of Wisconsin, certify that the

 3     foregoing is a true and accurate record of the proceedings held

 4     on the 22nd day of April, 2022, before the Honorable

 5     James D. Peterson, Chief U.S. District Judge for the Western

 6     District of Wisconsin, in my presence and reduced to writing in

 7     accordance with my stenographic notes made at said time and

 8     place.

 9          Dated this 10th day of May, 2022.

10

11

12

13

14

15                              _____/s/ Jennifer L. Dobbratz_____

16                              Jennifer L. Dobbratz, RMR, CRR, CRC
                                     Federal Court Reporter
17

18

19

20

21

22

23

24     The foregoing certification of this transcript does not apply to
       any reproduction of the same by any means unless under the
25     direct control and/or direction of the certifying reporter.
```

A-3

# United States District Court

## Western District of Wisconsin

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| | (for offenses committed on or after November 1, 1987) |
| V. | **Case Number:**  0758 3:21CR00056-001 |
| Steven Sorensen | **Defendant's Attorney:**  Alexander P. Vlisides |

Defendant, Steven Sorensen, pleaded guilty to Count 1 of the indictment.

Defendant has been advised of his right to appeal.

**ACCORDINGLY**, defendant is adjudicated guilty of the following offense:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. §§ 922(g)(1) and 924(a)(2) | Possession of a Firearm by a Felon, Class C Felony | March 6, 2021 | 1 |

Defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

**IT IS FURTHER ORDERED** that defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, defendant shall notify the court and United States Attorney of any material change in defendant's economic circumstances.

| | | |
|---|---|---|
| **Defendant's Date of Birth:** | ███████, 1978 | April 22, 2022 |
| **Defendant's USM No.:** | 60938-509 | Date of Imposition of Judgment |
| **Defendant's Residence Address:** | Eau Claire County Jail 710 2nd Avenue Eau Claire, Wisconsin 54703 | /s/ James D. Peterson |
| **Defendant's Mailing Address:** | Same as above | James D. Peterson |
| | | District Judge |
| | | April 22, 2022 |
| | | Date Signed |

# IMPRISONMENT

As to Count 1 of the indictment, it is adjudged that defendant is committed to the custody of the Bureau of Prisons for a term of 34 months, which is to begin today. (Pursuant to § 5G1.3, I have accounted for the time he has spent in primary state custody and adjusted his federal sentence accordingly. The otherwise appropriate 48-month sentence has been reduced by 14 months, to a term of 34 months.) I recommend that defendant receive a substance abuse evaluation and appropriate treatment. I also recommend defendant be afforded prerelease placement in a residential reentry center with work release privileges.

Defendant is in primary state custody and has pending cases in Washington County, Minnesota, District Court Case No. 82CR194913; Anoka County, Minnesota, District Court Case No. 02CR197730, Eau Claire County, Wisconsin, Circuit Court Case Nos. 20CF863, 21CF240, 21CF278, and 21CF241. According to the U.S. Supreme Court's ruling in *Setser v. United States*, 132 S. Ct. 1463 (2012), I have the discretion to indicate whether the federal sentence is intended to run concurrently with or consecutively to any other sentence that may be imposed. (USSG § 5G1.3, Background Commentary). I will stand silent on these pending state cases, believing that the state judges are in the best position to decide if additional punishment is appropriate considering the sentence I imposed today. The Bureau of Prisons will determine if sentence credit is to be awarded for time spent in custody that was not credited to any other sentence.

Defendant also has pending revocation proceedings in Eau Claire County Circuit Court Case Nos. 19CF624, 19CF1294, 19CF1622, and 19CF1679. According to *Setser* and § 5G1.3, I have the discretion to indicate whether the federal sentence is intended to run concurrently with or consecutively to any sentences that may be imposed. I recommend that any revocation sentences that may be imposed in these cases run concurrently with the federal sentence.

The U.S. Probation Office is to notify local law enforcement agencies, and the state attorney general, of defendant's release to the community.

# RETURN

**I have executed this judgment as follows:**

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
United States Marshal

By  _____
Deputy Marshal

DEFENDANT:    STEVEN SORENSEN
CASE NUMBER:    0758 3:21CR00056-001

# SUPERVISED RELEASE

The term of imprisonment is to be followed by a three-year term of supervised release, subject to the mandatory conditions. In light of the nature of the offense and the defendant's personal history, I adopt condition numbers 1 through 16 as proposed and justified in the presentence report.

Although the offense is not drug related, the defendant has a history of drug use. The mandatory drug testing as set forth at 18 U.S.C. § 3583(d) is not waived. This requirement is addressed in the special conditions.

If, when defendant is released from confinement to begin his term of supervised release, either the defendant or the supervising probation officer believes that any of the conditions imposed today are no longer appropriate, either one may petition the Court for review.

Defendant is to abide by the statutory mandatory conditions.

### Statutory Mandatory Conditions

Defendant shall not commit another federal, state, or local crime. [Note: Any defendant that has been convicted of a felony offense, or is a prohibited person, shall not possess a firearm, ammunition, or destructive device pursuant to 18 U.S.C. §§ 921 and 922.]

Defendant shall not illegally possess a controlled substance. The defendant is subject to drug testing according to 18 U.S.C. §§ 3563(a)(5) and 3583(d).

Defendant shall cooperate with the collection of DNA by the U.S. Justice Department and/or the U.S. Probation and Pretrial Services Office as required by Public Law 108-405.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Financial Penalties sheet of this judgment.

Defendant shall comply with the standard and special conditions that have been adopted by this court.

### Standard Conditions of Supervision

1) Defendant shall not knowingly leave the judicial district in which defendant is being supervised without the permission of the Court or probation officer;

2) Defendant is to report to the probation office as directed by the Court or probation officer and shall submit a complete written report within the first five days of each month, answer inquiries by the probation officer, and follow the officer's instructions. The monthly report and the answer to inquiries shall be truthful in all respects unless a fully truthful statement would tend to incriminate defendant, in violation of defendant's constitutional rights, in which case defendant has the right to remain silent;

3) Defendant shall maintain lawful employment, seek lawful employment, or enroll and participate in a course of study or vocational training that will equip defendant for suitable employment, unless excused by the probation officer or the Court;

4) Defendant shall notify the probation officer within seventy-two hours of any change in residence, employer, or any change in job classification;

5) Defendant shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician. Defendant shall not use any product containing cannabidiol (CBD) or tetrahydrocannabinol (THC), except as prescribed by a physician;

6) Defendant shall not visit places where defendant knows or has reason to believe controlled substances are illegally sold, used, distributed, or administered;

7) Defendant shall not meet, communicate, or spend time with any persons defendant knows to be engaged in criminal activity or planning to engage in criminal activity;

8) Defendant shall permit a probation officer to visit defendant at home, work, or at some other mutually convenient location designated by the probation officer at any reasonable time and shall permit confiscation of any contraband observed in plain view by the probation officer;

9) Defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

10) Defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the Court;

11) Defendant shall report to the probation office in the district to which defendant is released within 72 hours of release from the custody of the Bureau of Prisons, unless instructed by a U.S. probation officer to report within a different time frame; and

12) Defendant shall not possess a firearm, ammunition, destructive device, or dangerous weapon.

### Special Conditions of Release

13) Provide the supervising U.S. Probation Officer any and all requested financial information, including copies of state and federal tax returns.

14) Submit person, property, residence, papers, vehicle, or office to a search conducted by a U.S. Probation Officer at a reasonable time and manner, whenever the probation officer has reasonable suspicion of contraband or of the violation of a condition of release relating to substance abuse or illegal activities; failure to submit to a search may be a ground for revocation; defendant shall warn any other residents that the premises defendant is occupying may be subject to searches pursuant to this condition.

15) Participate in mental health referral, assessment, and treatment as approved by the supervising U.S. Probation Officer and comply with all rules, regulations, and recommendations of the mental health agency or its representative to the extent approved by the supervising U.S. Probation Officer. If defendant is eligible for funding from any source to cover the cost of treatment, defendant is to make reasonable efforts to obtain such funding. Participation in treatment does not require payment by defendant unless it is clear defendant can afford it.

16) Participate in a substance abuse evaluation and recommended treatment. If defendant is eligible for funding from any source to cover the cost of treatment, defendant is to make reasonable efforts to obtain such funding. Participation in treatment does not require payment by defendant unless it is clear defendant can afford it. Defendant shall submit to drug testing beginning within 15 days of defendant's release and 60 drug tests annually thereafter. The probation office may utilize the Administrative Office of the U.S. Courts' phased collection process.

DEFENDANT:    STEVEN SORENSEN
AO 245 B (Rev. 3/01)(N.H. Rev.)          CASE NUMBER:    0758 3:21CR00056-001                                    Judgment - Page 5

ACKNOWLEDGMENT OF CONDITIONS

I have read or have had read to me the conditions of supervision set forth in this judgment, and I fully understand them. I have been provided a copy of them. I understand that upon finding a violation of probation or supervised release, the Court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

_____          _____
Defendant                                                                      Date

_____          _____
U.S. Probation Officer                                                   Date

DEFENDANT:   STEVEN SORENSEN
CASE NUMBER:   0758 3:21CR00056-001

AO 245 B (Rev. 3/01)(N.H. Rev.)                                                                                                    Judgment - Page 6

# CRIMINAL MONETARY PENALTIES

Defendant shall pay the following total financial penalties in accordance with the schedule of payments set forth below.

| Count | Assessment | Fine | Restitution |
|-------|-----------|------|-------------|
| 1 | $100.00 | $0.00 | $0.00 |
| **Total** | $100.00 | $0.00 | $0.00 |

It is adjudged that the defendant is to pay a $100.00 criminal assessment penalty to the Clerk of Court for the Western District of Wisconsin immediately following sentencing. Defendant is encouraged to pay the assessment as agreed upon in the plea agreement to ensure he is not precluded from participating in programming for non-payment while in the federal prison system.

Defendant does not have the means to pay a fine under § 5E1.2(c) without impairing his ability to support himself upon release from custody, so I will impose no fine.

# SCHEDULE OF PAYMENTS

Payments shall be applied in the following order:

(1) assessment;
(2) restitution;
(3) fine principal;
(4) cost of prosecution;
(5) interest;
(6) penalties.

The total fine and other monetary penalties shall be due in full immediately unless otherwise stated elsewhere.

Unless the court has expressly ordered otherwise in the special instructions above, if the judgment imposes a period of imprisonment, payment of monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of court, unless otherwise directed by the court, the probation officer, or the United States Attorney.

Defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

In the event of a civil settlement between victim and defendant, defendant must provide evidence of such payments or settlement to the Court, U.S. Probation office, and U.S. Attorney's office so that defendant's account can be credited.